792 A.2d 1197

**Lonnie Lee EDWARDS,**

v.

**STATE of Maryland.**

**No. 01418, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

March 5, 2002.

Jerome H. Nickerson, Columbia, for appellant.

Steven L. Holcomb, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Joseph I. Cassily, State's Atty. for Harford County, Bel Air, on the brief), for appellee.

Argued before HOLLANDER, KRAUSER, PAUL E. ALPERT (Retired, Specially Assigned) JJ.

HOLLANDER, Judge.

In this case, we must determine whether the Circuit Court for Harford County erred in denying a suppression motion filed by Lonnie Lee Edwards, appellant, concerning marijuana and a knife recovered from a vehicle in which appellant was a passenger. Resolution of that issue requires us to determine

whether the police executed a valid traffic stop of the vehicle under Md.Code (1974, 1991 Repl.Vol.), § 21–309 of the Transportation Article ("Tr."), after it crossed over the center line of a two lane divided highway.

Following the denial of the suppression motion, Edwards was tried by the court, pursuant to an agreed statement of facts.[1] The court subsequently found appellant guilty of possession of a concealed weapon and possession of marijuana,[2] and sentenced him to concurrent terms of one year incarceration, with all but 90 days suspended. On appeal, appellant poses one question:

> [W]hether or not a one time crossing of the centerline of a[n] undivided deserted highway constitutes probable cause for a violation of failing to maintain lane pursuant to Maryland Code (1997, 1999) Repl.Vol. § 21–309, as that statute was interpreted in, *Rowe v. State*, 363 Md. 424, 769 A.2d 879 (2001)[.]

For the reasons that follow, we shall affirm.

## FACTUAL SUMMARY[3]

The court held a suppression motion hearing on June 15, 2001. What follows is a summary of the evidence in the light most favorable to the State.

On October 24, 2000, at about 3:15 a.m., State Trooper Timothy Mullin was on patrol in Harford County in an unmarked vehicle, traveling north on Route 152 in the vicinity of Route 7. At that time, he observed a maroon Dodge Caravan traveling on Route 152, a two-lane highway divided by a center line, with one travel lane in each direction. While

---

1. We note that the court granted appellant's motion to suppress his statement to the police that he was part American Indian and had a legal right to possess marijuana.

2. The court did not adjudicate the charge of possession of paraphernalia.

3. In view of the issue presented, we shall include only a summary of the facts from the suppression hearing.

following the van for about a mile, the trooper observed it cross the center dividing line of the "two-lane" road. The trooper recalled that the "distance that the vehicle traveled in which it crossed the center line was approximately a quarter mile."

Accordingly, the trooper effected a traffic stop of the van. Appellant's girlfriend, Jennifer Badessa, was the driver of the vehicle. Appellant, who was seated in the front, was the only passenger.

At the hearing, Trooper Mullin testified as to his reason for making the traffic stop. The following colloquy is relevant:

[TROOPER MULLIN]: We were traveling north. Route 152 in that area is divided by a concrete median. Once we got past the concrete median where there was a center lane [sic], *I observed the Caravan in front of me cross the line by approximately one foot on several occasions.* I then activated my emergency equipment and stopped the vehicle in the slow shoulder on northbound 152 in the area of Franklinville Road.

\* \* \*

[PROSECUTOR]: Now, the observation you made of the vehicle crossing the center line, so I understand, this section of 152 at this point, is it a two-lane road?

[TROOPER MULLIN]: Correct, with a center line, no median.

[PROSECUTOR]: So when you are referring to the center line, you are talking about crossing into the oncoming traffic, not crossing into a passing lane?

[TROOPER MULLIN]: Correct.

On cross-examination, the following ensued:

[APPELLANT'S COUNSEL]: Okay. Besides your vehicle and the defendant's vehicle, there weren't any other vehicles in the immediate area, were there?

[TROOPER MULLIN]: I can't recall, but normally at that time of the morning, there are not too many vehicles.

[APPELLANT'S COUNSEL]: Okay. And you came in behind the Dodge Caravan, and other than the failure to maintain her lane, the vehicle crossed and touched by one foot the white line; is that right?

[TROOPER MULLIN]: No. *He [sic] crossed the center line by one foot.*

[APPELLANT'S COUNSEL]: When you say by one foot, you're talking about the right tires of the Dodge Caravan crossing into the lane by one foot. Is that what you meant?

[TROOPER MULLIN]: *The left side tires crossed the center line, both center lines, by approximately one foot. . . . [T]he center line is on the left side of the vehicle.*

[APPELLANT'S COUNSEL]: After that happened, the vehicle went back into the travel lane; is that correct?

[TROOPER MULLIN]: Correct.

[APPELLANT'S COUNSEL]: And your testimony on direct was that happened on several occasions. *Did you mean you witnessed that on two occasions?*

[TROOPER MULLIN]: I would say three. Approximately three times.

[APPELLANT'S COUNSEL]: And the three times that happened, was it the same scenario, that the wheels would cross in a foot and then come back into the travel lane?

[TROOPER MULLIN]: Correct.

\* \* \*

[APPELLANT'S COUNSEL]: You observed no other traffic offenses? That was why you stopped this vehicle, correct?

[TROOPER MULLIN]: As far as I know, that's why I stopped the vehicle, for crossing the center line.

(Emphasis added).

Trooper Mullin acknowledged that neither his Statement of Probable Cause nor the criminal complaint indicated the number of times that he observed the van cross the center line. Moreover, he could not recall whether he had issued a citation

to Ms. Badessa for failing to maintain her lane, or for any other traffic citation.

In any event, Trooper Mullin recalled that, after stopping the van, he approached the driver's side window. The driver had already lowered the window, and the trooper immediately "detected a strong odor of burnt marijuana emitting from the vehicle." The defense stipulated that the officer is "trained in sensing and detecting burnt marijuana." Upon detecting the odor of marijuana, Trooper Mullin ordered Ms. Badessa and appellant out of the van and then conducted a search of the vehicle. In doing so, the trooper found the marijuana and a dagger.[4]

Trooper Mullin recalled that the "glove box," located under the front passenger seat, was locked, but he obtained the key from appellant. He found a glass jar in the glove box, which contained marijuana, marijuana seeds, and wrapping papers. On the floorboard directly in front of the passenger seat, the trooper recovered a five-inch dagger in a sheath. Additionally, Trooper Mullin conducted a field sobriety test of Ms. Badessa, from which he concluded that she was not driving under the influence.

Ms. Badessa testified that she saw two State police cars at the intersection of Routes 40 and 152, and was aware that the police were following her. Therefore, she activated her cruise control. In doing so, Ms. Badessa acknowledged that she may have "swerved," but insisted "that was it." She offered no other explanation for crossing the center line. Ms. Badessa also said: "I didn't go all the way into the other lane. I mean, maybe the wheel, because I had to take one of my hands off the wheel to do the cruise control to set it, so maybe I went onto the center line.... Honestly, I don't think I went all the way over the center line." Moreover, she claimed that there were no other vehicles on the road in the area, except for the police cars. On cross-examination, Ms. Badessa reiterated

---

**4.** Another trooper pulled up behind Trooper Mullin, and a third State Police unit also responded.

that she "was not all the way over" the line, and claimed that "[t]here was no traffic."

When the trooper approached the van, Ms. Badessa recalled that he said: "I pulled you over for driving right of center," and "gave her a ticket." Ms. Badessa also recounted that the trooper said he "smelled marijuana." Further, Ms. Badessa claimed that after she was subjected to field sobriety tests, the police asked for the keys to the glove box, located underneath the passenger seat. Ms. Badessa explained that she did not have keys to the box and, when the police asked appellant for the keys, he did not want to surrender them. Nevertheless, Ms. Badessa maintained that the keys were "forcibly" removed from appellant. Thereafter, the police found the marijuana. Ms. Badessa testified that she heard Edwards acknowledge that the marijuana belonged to him.

The circuit court found that the traffic stop was lawful, and therefore it denied the motion to suppress the marijuana and the dagger. It reasoned, in relevant part:

Trooper Mullin fell in behind the subject vehicle.

\* \* \*

I find as fact that he observed at least one occasion where the vehicle crossed the center line by at least a foot into the oncoming traffic lane. This is verified by Ms. Badessa's testimony that that well could have happened when she put on the cruise control so she wouldn't speed. I don't think it matters whether I find that incidents two or three occurred because at least on one occasion I am completely satisfied she did cross the center line into the oncoming traffic lane by a foot or more.

Even without oncoming traffic, it being late at night, it's still a dangerous maneuver of more significance than crossing a shoulder line as was discussed in *Rowe v. Maryland.* I find this case is clearly distinguishable from *Rowe v. Maryland,* reported at 363 Md. 424, 769 A.2d 879.

I find as a fact, as a matter of law, that this was a valid motor vehicle stop by Trooper Mullin. When he ap-

proached the vehicle, he noticed a strong odor of marijuana, and this gave him the right under the *Carroll v. United States* doctrine to search the vehicle for evidence of a crime without a warrant, and that gave him the right to search not only the vehicle but the locked glove box container under the passenger side of the vehicle.

So I find that the search and seizure of the items inside the car was valid; therefore, the seizure of the knife and the marijuana was lawful.

Thereafter, on July 11, 2001, appellant waived his right to trial by jury and pleaded not guilty as to all charges. The parties adopted the facts adduced at the suppression hearing, supplemented, *inter alia,* by the report of the crime lab identifying the substance recovered from the vehicle as marijuana.

We shall include additional facts in our discussion.

## DISCUSSION

### I.

Our review of the trial court's ruling with respect to a suppression motion "ordinarily is limited to information contained in the record of the suppression hearing." *Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519 (2000); *see Ferris v. State,* 355 Md. 356, 368, 735 A.2d 491 (1999); *State v. Fernon,* 133 Md.App. 41, 43, 754 A.2d 463 (2000). Moreover, we review the evidence in the light most favorable to the State as the prevailing party. *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990); *see Charity v. State,* 132 Md.App. 598, 606, 753 A.2d 556, *cert. denied,* 360 Md. 487, 759 A.2d 231 (2000) (stating that "[o]ur ruling will be based exclusively on the [prevailing party's] most favorable version of the events."). In our review, we give due regard to the motion judge's opportunity to assess the credibility of the witnesses. *McMillian v. State,* 325 Md. 272, 281–82, 600 A.2d 430 (1992); *Fernon,* 133 Md.App. at 43, 754 A.2d 463.

Unless clearly erroneous, we defer to the factual findings of the suppression judge as to first-level findings of fact. See *Ferris,* 355 Md. at 368, 735 A.2d 491; *Fernon,* 133 Md.App. at 44, 754 A.2d 463; *Charity,* 132 Md.App. at 606, 753 A.2d 556. Nonetheless, we must make our own independent constitutional appraisal as to whether a stop or search was lawful. *See Ornelas v. United States,* 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *Cartnail,* 359 Md. at 282–83, 753 A.2d 519; *Fernon,* 133 Md.App. at 44, 754 A.2d 463. We accomplish this by reviewing the law and applying it to the first-level facts found by the suppression judge. *In re Tariq A–R–Y,* 347 Md. 484, 489, 701 A.2d 691 (1997), *cert. denied,* 522 U.S. 1140, 118 S.Ct. 1105, 140 L.Ed.2d 158 (1998); *Riddick,* 319 Md. at 183, 571 A.2d 1239; *Howard v. State,* 112 Md.App. 148, 156, 684 A.2d 491 (1996), *cert. denied,* 344 Md. 718, 690 A.2d 524 (1997).

## II.

Appellant argues that, "absent reasonable articulable suspicion or probable cause for a violation of § 21–309(b)," the trooper violated the Fourth Amendment when he stopped the van.[5] He asserts that "[t]he sole question presented in this appeal is whether a law enforcement officer who views a vehicle's wheels momentarily cross the center line of a[n] undivided highway absent something more constitutes probable cause for a violation [of] Maryland Code (1997, 1999 Repl.Vol.) [, Transportation Article,] § 21–309(b)."

Edwards contends that the circuit court found a one-time crossing and, relying on the recent case of *Rowe v. State,* 363 Md. 424, 769 A.2d 879 (2001), he asserts that "a one-time crossing of the center line fails to establish probable cause for a violation of Tr. § 21–309(b)." In appellant's view, *Rowe* eschewed the literal interpretation of Tr. § 21–309(b), in favor of an interpretation that focuses exclusively on the safety of a

---

**5.** The State does not contend that, as a passenger, appellant cannot complain about the traffic stop. Therefore, we shall not discuss appellant's "standing" to contest the traffic stop.

lane change. Thus, appellant maintains that the trial court erred in distinguishing this case from *Rowe* and finding, instead, that "a one time centerline crossing of the centerline was qualitatively different in nature then [sic] crossing the shoulder...."

We begin our analysis with a brief review of the Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment. *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Owens v. State,* 322 Md. 616, 622, 589 A.2d 59, *cert. denied* 502 U.S. 973, 112 S.Ct. 452, 116 L.Ed.2d 470 (1991). The Fourth Amendment guarantees, *inter alia,* " '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures....' " *Rosenberg v. State,* 129 Md.App. 221, 239, 741 A.2d 533 (1999), *cert. denied,* 358 Md. 382, 749 A.2d 173 (2000) (internal citations omitted). Nevertheless, "[t]he Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno,* 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) (citing *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)); *see United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *Rosenberg,* 129 Md.App. at 239, 741 A.2d 533.

In *Ferris v. State,* 355 Md. 356, 735 A.2d 491 (1999), the Court recognized that

> a traffic stop involving a motorist is a detention which implicates the Fourth Amendment.... It is equally clear, however, that ordinarily such a stop does not initially violate the federal Constitution if the police have probable cause to believe that the driver has committed a traffic violation.

*Id.* at 369, 735 A.2d 491 (internal citation omitted); *see also Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Probable cause has been defined as "a non-technical conception of a reasonable ground for belief for guilt, requiring less evidence for such belief than would justify conviction but more evidence ... than mere suspicion." *Doer-*

ing *v. State,* 313 Md. 384, 403, 545 A.2d 1281 (1988); *see also Collins v. State,* 322 Md. 675, 680, 589 A.2d 479 (1991). As the Supreme Court said in *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), "in dealing with probable cause, . . . as the very name implies, we deal with probabilities."

Moreover, in *Rowe v. State,* 363 Md. at 433, 769 A.2d 879, the Court reiterated that a lawful traffic stop may also rest upon reasonable, articulable suspicion. It said:

A traffic stop may also be constitutionally permissible where the officer has a reasonable belief that "criminal activity is afoot." Whether probable cause or a reasonable articulable suspicion exists to justify a stop depends on the totality of the circumstances. Thus, the Supreme Court has held that the Fourth Amendment is violated:

"Where there is neither probable cause to believe nor reasonable suspicion that the car is being driven contrary to the laws governing the operation of motor vehicles or that either the car or any of its occupants is subject to seizure or detention in connection with the violation of any other applicable laws."

(quoting *Delaware v. Prouse,* 440 U.S. 648, 650, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)) (internal citations omitted).

■■ Even without probable cause to stop a vehicle, it is clear that the police may effect a lawful stop of a motorist, so long as the officer is " 'able to point to specific and articulable facts which, taken together with rational inferences from these facts, reasonably warrant that intrusion.' " *Ferris,* 355 Md. at 384, 735 A.2d 491 (internal citations omitted); *see Rowe,* 363 Md. at 433, 769 A.2d 879. As we said in *Pryor v. State,* 122 Md.App. 671, 679, 716 A.2d 338, *cert. denied,* 352 Md. 312, 721 A.2d 990 (1998): "It is well settled . . . that the forcible stop of a motorist may be based on reasonable articulable suspicion that is insufficient to establish probable cause."

### III.

In the case *sub judice,* the trooper stopped the van for failure to drive in a single lane, in violation of Tr. § 21–309.

Section 21–309(a) specifies that it applies to "any roadway that is divided into two or more clearly marked lanes for vehicular traffic...." Subsection (b) of § 21–309 states:

(b) *Driving by single lane required.*—A vehicle shall be driven as nearly as practicable entirely within a single lane and may not be moved from that lane or moved from a shoulder or bikeway into a lane until the driver has determined that it is safe to do so.

As we noted, appellant contends that this case is controlled by *Rowe*, 363 Md. 424, 769 A.2d 879. There, the Court considered the legality of a traffic stop of the defendant made at about 1:00 a.m. on Interstate 95, after a State Trooper saw the defendant drive about eight inches over the white "edge-line" separating the slow travel lane of Interstate 95 from the shoulder, then swerve back to the travel portion and, a short time later, again touch the white edge line. For "the benefit of the petitioner," *id.* at 427, 769 A.2d 879, the trooper executed a stop of the defendant "[f]or failing to drive in a single lane," in violation of Tr. § 21–309(b). A subsequent consent search led to the discovery of 77 pounds of marijuana.

Thereafter, the defendant moved to suppress the marijuana, claiming, *inter alia,* that the trooper lacked probable cause to effect the traffic stop. The trooper testified at the hearing that the van "swerved or weaved back onto the white shoulder edge line ....", and he was aware, given the hour, that people were returning home from bars, intoxicated or tired. The trial court found that the stop was legal and denied the defendant's suppression motion. The defendant was subsequently convicted of possession of marijuana with the intent to distribute and other offenses.

On appeal, the Court considered whether, under the circumstances, the crossing evidenced erratic or unsafe driving, in violation of Tr. § 21–309, so as to justify the stop. *Id.* at 441, 769 A.2d 879. It concluded that the "momentary crossing of the edge line of the roadway ... did not amount to an unsafe lane change or unsafe entry onto the roadway," in violation of

the statute. *Id.* Consequently, it determined that the stop was unlawful. *Id.*

In reaching that decision, the Court construed Tr. § 21–309, focusing on the text and context. The Court concluded that a driver does not violate the statute merely because he or she fails to stay entirely within a lane. Rather, a violation occurs when movement is not safe or when it is not done safely. *Id.* at 437, 769 A.2d 879. The Court said that, "to be in compliance, a vehicle must be driven as much as possible in a single lane and movement into that lane from the shoulder or from that lane to another one cannot be made until the driver has determined that it can be done safely ... [T]he purpose of the statute is to promote safety on laned roadways." *Id.* at 434, 769 A.2d 879.

After reviewing cases from other jurisdictions with similar statutes, the Court also noted that those cases generally required "more for violation than a momentary crossing or touching of an edge or lane line," *id.* at 438, 769 A.2d 879, or a brief, one-time straddling of a lane line. Moreover, the Court noted that those courts that had upheld traffic stops based on violations of statutes similar to Tr. § 21–309 involved "conduct much more egregious" than was involved in *Rowe. Id.* at 439, 769 A.2d 879.

The factual centerpiece of appellant's argument is his contention that the trial court found that Ms. Badessa only crossed the center line "on one occasion." He recognizes that Trooper Mullin said that Ms. Badessa crossed the center line several times, but observes that "only one crossing went undisputed by the defense," and therefore the court's finding as to one crossing was not clearly erroneous and must be upheld. Based on that factual predicate, appellant maintains that the driver's action was momentary, akin to the defendant's conduct in *Rowe,* and that a "one time momentary crossing of the centerline absent something more" does not amount to probable cause or reasonable suspicion to justify a stop under Tr. § 21–309.

Thus, appellant asserts that "[t]he error engaged in by the lower court was its belief that a vehicle on a two way highway which [briefly and momentarily] crosses the centerline was *per se* not being operated safely," even if there was no oncoming traffic at the time. In his view, the circuit court improperly "relieved" the State "from establishing a necessary element of the offense; the movement was unsafe."

In the first instance, we reject appellant's underlying premise that the court found a single, isolated instance of crossing the center line. Rather, it found that there was *at least* one crossing of the center line, which Ms. Badessa "verified" in her testimony. Appellant overlooks that the court's finding of "at least one crossing" does not mean "no more than one crossing." Indeed, Trooper Mullin testified at the hearing that there were "approximately" three crossings, but the court did not believe it necessary to specify the exact number of times that appellant crossed the center line. It said: "I don't think it matters whether I find that incidents two or three occurred...." Rather, it reasoned that the legality of the stop did not turn on the number of times that Ms. Badessa crossed the center line. The trial court found *Rowe* distinguishable because that case concerned a crossing from the slow lane into the shoulder area, while the case *sub judice* involved the driver crossing the center line of a two way road, with one lane in each direction, "by at least a foot into the oncoming traffic lane."

To be sure, the incident did not occur at an hour when the road was flooded with traffic. Moreover, the statute in issue only requires a vehicle to be driven "as nearly as practicable" in a single lane, and there may well be "myriad reasons," *Hernandez v. State*, 983 S.W.2d 867, 870 (Tex.App.1998), why a vehicle might drift across a lane line. These could include road conditions, terrain, or weather. *See United States v. Gregory*, 79 F.3d 973, 978 (10th Cir.1996). But, the evidence did not show any circumstance of that nature that would have been apparent to the trooper. Moreover, the court was of the view that crossing the line into an oncoming lane of traffic is inherently dangerous, and qualitatively different from the

situation in *Rowe.* At the very least, even an inadvertent entry into a lane for oncoming traffic gave the officer reasonable suspicion of a traffic violation.

In our view, the distinction drawn by the circuit court between *Rowe* and the case *sub judice* was a sound one. Many of the out-of-state cases cited by the Court of Appeals in *Rowe* to illustrate situations in which a driver was found not to have violated a comparable statute are factually distinguishable. For example, the Court cited cases involving multiple crossings onto or over the edge line of the slow, far right traffic lane (*see, e.g., Montana v. Lafferty,* 291 Mont. 157, 162–63, 967 P.2d 363 (1998)); crossing of a lane dividing line into a lane of traffic proceeding in the same direction, when there was no indication that it was unsafe or dangerous (*see, e.g., Hernandez v. State,* 983 S.W.2d at 871); multiple or single crossings of the edge line into the emergency or shoulder area, without any indication of other cars in the vicinity (*see, e.g., United States v. Gregory,* 79 F.3d at 978; *Crooks v. State,* 710 So.2d 1041, 1043 (Fla.App.1998)).

On the other hand, there are numerous cases from other jurisdictions, some of which were cited by the Court in *Rowe,* in which courts have upheld traffic stops based on violations of similar statutes. *See, e.g., State v. Banks,* 1999 WL 980340, 1999 Ohio App. LEXIS 5070 (Ohio Ct.App.1999) (upholding traffic stop of defendant who drove left of double yellow lines by approximately two and one-half to three feet, for approximately ten to fifteen yards, and almost had head-on collision with oncoming vehicle); *Commonwealth v. Howard,* 762 A.2d 360 (Pa.Super.2000) (multiple crossings of the fog line onto the unpaved portion of the right berm as well as two crossings of yellow center line).

Other cases are also noteworthy. For example, in *United States v. Cervine,* 169 F.Supp.2d 1204 (D.Kan.2001), the defendant was driving on a four lane highway divided by a median, and the police saw his vehicle cross the line separating the driving lane from the passing lane. Significantly, the crossing happened one time, for about two seconds. The police then

executed a traffic stop, which led to the recovery of drugs. At the suppression hearing, the defendant admitted that his left tires could have crossed the center line. The court held that the police had a sufficient basis to make a traffic stop under the applicable statute.[6]

*United States v. Barahona,* 990 F.2d 412 (8th Cir.1993), is also instructive. There, the court upheld a traffic stop of a vehicle that changed lanes on a Missouri road without using a turn signal, and then went "partially" onto the shoulder of the road, before returning to the lane. *Id.* at 414. The court said: "It is clear that the initial stop of [the defendant's] car was valid.... [T]he threat to highway safety posed by the erratic movements of [the] vehicle clearly constituted a legitimate reason for the stop." *Id.* at 416.

*Zimmerman v. North Dakota Department of Transportation Director,* 543 N.W.2d 479 (N.D.1996), is also noteworthy. The case involved an administrative suspension of a driver's license based on an alcohol violation. The court held that, by driving across the center line of the roadway on one occasion, the defendant committed a moving violation, which gave the officer a reasonable basis for an investigative stop.

*State v. Strassman,* 1998 WL 833592, 1998 Ohio App. LEXIS 5626 (Ohio Ct.App.1998), also provides guidance. In that case, the court concluded that the police officer had reasonable suspicion to stop the defendant's vehicle, because it had crossed the yellow center line by approximately one to two feet, on two occasions, for approximately two hundred feet. Similarly, in *State v. Parks,* Nos. C–970814, C–970815, 1998 WL 636981, 1998 Ohio App. LEXIS 4278 (Ohio Ct.App.1998) (per curiam), the court determined that the officer's traffic stop was based on reasonable, articulable suspicion of a traffic

---

6. The statute provided, in relevant part:

All vehicles in motion upon a highway having two or more lanes of traffic proceeding in the same direction shall be driven in the right-hand lane except when overtaking and passing another vehicle or when preparing to make a proper left turn or when otherwise directed by traffic markings, signs or signals.
Mo.Rev.Stat. § 304.015(6).

infraction, because the officer observed the car swerve across the double-yellow line and then swerve back into the right lane in front of the police cruiser to avoid hitting it.

In *United States v. Botero–Ospina,* 71 F.3d 783 (10th Cir.(1995)), *cert. denied,* 518 U.S. 1007, 116 S.Ct. 2529, 135 L.Ed.2d 1052 (1996), the court considered the constitutionality of a pretextual stop. It said that a traffic stop is valid, *inter alia,* if it is based on an observed traffic violation. The court upheld a stop made after the car swerved from the outside lane, straddled the center line, and swerved back to the outside lane; the police officer was concerned that the driver was either fatigued or under the influence of drugs or alcohol. Because lane straddling and driving under the influence are illegal under Utah law, the court concluded that the stop was "fully warranted." *Id.* at 788.

## CONCLUSION

We conclude that the circuit court properly determined that, under the circumstances of this case, crossing the center line of an undivided, two lane road by as much as a foot, on at least one occasion, provided a legally sufficient basis to justify the traffic stop. To be sure, *Rowe* did not establish a bright line rule that bars a traffic stop when the officer witnesses a driver briefly cross a center line marking the boundary of opposing traffic lanes. Although there are occasions when a driver on a two lane road may use the opposing lane to overtake or pass another vehicle traveling in the same lane, that circumstance was not presented in this case. Nor was there any indication that the trooper was aware of other legitimate factors or phenomena to explain the line crossing, such as weather, terrain, or road conditions.

Unlike in *Rowe,* which involved a brief crossing of an edge line separating the slow lane from a shoulder area, the driver here entered the lane designated for oncoming traffic. Given the danger associated with veering into an opposing lane of traffic, even briefly, we agree with the circuit court that the traffic stop was valid.

172

JUDGMENT OF THE CIRCUIT COURT FOR HAR-
FORD COUNTY AFFIRMED. COSTS TO BE PAID BY
APPELLANT.