18 A.3d 168

**James Adam STEPHENS, III**

v.

**STATE of Maryland.**

**No. 2982, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

April 28, 2011.

552

Allison P. Brasseaux (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for Appellant.

Sharon S. Street (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: WOODWARD, MATRICCIANI, and RAYMOND G. THIEME, JR., (Retired, Specially Assigned), JJ.

WOODWARD, J.

██ Appellant, James Adam Stephens, III, was charged in the District Court of Maryland for Frederick County with failure to obey a traffic control device, driving while under the influence of alcohol, driving while under the influence of alcohol per se, and driving while impaired. After appellant requested a jury trial, the case was transferred to the Circuit Court for Frederick County, Maryland. Appellant then elected to be tried by the court and was subsequently convicted of failure to obey a traffic control device and driving while under the influence of alcohol per se, with the remaining counts merged.[1] Appellant was sentenced to one year for driving

---

1. Although the court indicated that the driving under the influence of alcohol and driving while impaired charges merged into the driving

under the influence of alcohol per se, with all but ten days suspended, to be followed by two years supervised probation upon release.

Appellant timely appealed and presents the following question for our review: Was the evidence insufficient to support [appellant's] conviction for failure to obey a traffic control device?

For the following reasons, we shall affirm.

## BACKGROUND

On March 12, 2009, at approximately 3:00 a.m., Deputy Daniel Schlosser, of the Frederick County Sheriff's Office, was on patrol on Route 26 near Waterside Drive in Frederick County, Maryland, when he observed appellant driving a vehicle. Deputy Schlosser observed appellant "[s]werving in and out of his lane." Route 26 at this location is a three-lane highway, and appellant was driving in the middle lane. Deputy Schlosser saw appellant swerve into both adjacent lanes "[s]everal times." At one point, appellant swerved into another lane that was then occupied by another vehicle. As a result, that vehicle was forced to "slow down and pull onto the shoulder." Deputy Schlosser then stopped appellant's vehicle.

After approaching appellant's vehicle, Deputy Schlosser "detected alcohol on [appellant's] breath and [his] person." Appellant's eyes were bloodshot and glassy, and his movements were "sluggish and clumsy." Appellant admitted that he had consumed four beers earlier that evening, and appellant's speech was "[s]lurred, thick, [and] slow."

Appellant was ordered out of the vehicle, and Deputy Schlosser administered several field sobriety tests, including the horizontal gaze nystagmus test, the walk-and-turn test,

---

under the influence of alcohol per se conviction, the docket entries indicate that appellant was acquitted of the two remaining counts. Ordinarily, when the docket entries and the transcript conflict, the transcript of the proceedings controls. *Savoy v. State,* 336 Md. 355, 360 n. 6, 648 A.2d 683 (1994).

and the one-leg-stand test. Deputy Schlosser testified, over defense objection, that appellant's "eyes showed lack of smooth pursuit, distinct and sustained nystagmus at maximum deviation." Deputy Schlosser further testified that appellant exhibited six out of the six possible clues from the nystagmus test.[2]

Appellant also could not maintain his balance during the walk-and-turn test, and "[s]tepped off line several times." Appellant exhibited five clues out of a possible eight during this field sobriety test. Appellant also swayed during the one-leg-stand test, and exhibited two clues out of four in that test. Deputy Schlosser testified over objection that he believed appellant was under the influence of alcohol. Deputy Schlosser placed appellant under arrest and read appellant the DR–15 advice of rights form regarding an intoximeter test. Appellant agreed to submit to a breath test and Deputy Schlosser transported appellant to police headquarters.

Deputy Donald Linares, of the Frederick County Sheriff's Office, testified that he was a certified intoximeter operator. Deputy Linares saw that there was nothing present in appellant's mouth, and then waited twenty minutes before administering the test. After explaining the procedures used to test the intoximeter, Deputy Linares testified that the result of appellant's breath test was ".15 grams of alcohol for 210 meters of breath."

Appellant testified at trial and maintained that he was not swerving prior to being pulled over. He also claimed that he was stopped on Route 26, at a point before the road expanded to three lanes, for failing to stop at a stop sign. Appellant also testified that he signed the form agreeing to a breath test because "everybody tells me to sign it so I can leave. So of course I'm gonna sign whatever they put in my face."

---

**2.** Appellant objected on the grounds that Deputy Schlosser was offering inadmissible expert opinion as to the horizontal gaze nystagmus test under *State v. Blackwell*, 408 Md. 677, 971 A.2d 296 (2009). This issue is not raised on appeal.

## DISCUSSION

■ Appellant's sole contention in this Court is that the evidence was insufficient to sustain his conviction for failure to obey a traffic control device under Maryland Code (1977, 2009 Repl. Vol), § 21–201(a) of the Transportation Article ("T.A."), on the grounds that the marks on the road designating the lanes of traffic are not "traffic control devices" as defined by T.A. § 11–167. Additionally, appellant suggests that, whereas T.A. § 21–309 criminalizes swerving from lane to lane and T.A. § 11–168's definition of a "traffic control signal" does not include lane markings, "the term 'traffic control device' does not refer to the markings on the roadway that designate the lanes themselves." [3]

The State responds that the plain language of T.A. § 11–167 makes clear that "markings" refers to the lane designations on a roadway. The State also contends that T.A. § 21–309, which prohibits swerving from lane to lane, is "complementary, and not irreconcilable" with T.A. § 21–201(a), which prohibits the failure to obey a traffic control device. The State also asserts that, although all "traffic control signals" are "traffic control devices," not all "traffic control devices" are "traffic control signals." We agree with the State.

In reviewing the sufficiency of the evidence following an action tried without a jury, Maryland Rule 8–131(c) provides:

When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

---

**3.** Appellant's trial counsel did not raise these grounds when he moved for judgment of acquittal, either at the end of the State's case-in-chief or at the close of all the evidence. However, "[i]n a criminal action in which the court is the trier of fact, the appellate court must entertain the issue of the sufficiency of the evidence when presented on appeal even in the absence of a motion for judgment of acquittal below." *Barnes v. State*, 31 Md.App. 25, 29, 354 A.2d 499 (1976).

■ Further, following a bench trial, the test for sufficiency of the evidence is whether that evidence, if believed, directly or inferentially permits the court to be convinced, beyond a reasonable doubt, of the defendant's guilt. *State v. Smith,* 374 Md. 527, 533–34, 823 A.2d 664 (2003); *accord State v. Stanley,* 351 Md. 733, 750, 720 A.2d 323 (1998). In considering the legal sufficiency of the evidence following a non-jury trial, the appellate court must determine whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Albrecht,* 336 Md. 475, 479, 649 A.2d 336 (1994) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)) (emphasis in original) (quotations omitted).

The Court of Appeals also has explained that, "[w]hen the trial court's order involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are legally correct under a *de novo* standard of review." *Gray v. State,* 388 Md. 366, 375, 879 A.2d 1064 (2005) (quoting *Nesbit v. GEICO,* 382 Md. 65, 72, 854 A.2d 879 (2004)) (quotations omitted). In addition, this Court has stated:

> An assessment of the legal sufficiency of the evidence is not an evidentiary issue but a substantive issue, with respect to which an appellate court makes its own independent judgment, as a matter of law. This is an area wherein the reviewing court is not at all deferential to the trial court. It makes the same determination on the same basis as does the trial court. In assessing legal sufficiency, we will look only at that which was formally received in evidence.

*Polk v. State,* 183 Md.App. 299, 306, 961 A.2d 603 (2008); *accord Burlas v. State,* 185 Md.App. 559, 568, 971 A.2d 937, *cert. denied,* 410 Md. 166, 978 A.2d 245 (2009).

T.A. § 21–201(a) provides:

(a) *Obedience required.*—(1) Subject to the exceptions granted in this title to the driver of an emergency vehicle,

**the driver of any vehicle,** unless otherwise directed by a police officer, **shall obey the instructions of any traffic control device applicable to the vehicle** and placed in accordance with the Maryland Vehicle Law.

(2) The driver of a vehicle approaching an intersection controlled by a traffic control device may not drive across private property or leave the roadway for the purpose of avoiding the instructions of a traffic control device.

(Emphasis added).

A "traffic control device" is defined under T.A. § 11–167, as follows:

**"Traffic control device" means any** sign, signal, **marking,** or device **that:**

(1) Is not inconsistent with the Maryland Vehicle Law; and

(2) **Is placed by authority of an authorized public body or official to regulate, warn, or guide traffic.**

(Emphasis added).

Both parties agree that the issue with respect to the instant case is the meaning of the term "marking." Appellant contends that "the term 'marking' does not include the marks on the road that designate the lanes themselves." The State responds that "the lane designation marks on a roadway are 'markings,' as they are placed on the roadway to regulate and guide traffic."

Because this issue is a question of statutory interpretation, we begin with the principles that guide our analysis:

We have stated the controlling principles of statutory construction so often that only the briefest exposition is necessary. Our predominant mission is to ascertain and implement the legislative intent, which is to be derived, if possible, from the language of the statute (or Rule) itself. If the language is clear and unambiguous, our search for legislative intent ends and we apply the language as written and in a commonsense manner. We do not add words or ignore those that are there. If there is any ambiguity, we

may then seek to fathom the legislative intent by looking at legislative history and applying the most relevant of the various canons that courts have created.

*Downes v. Downes,* 388 Md. 561, 571, 880 A.2d 343 (2005).

The Court of Appeals has stated: "Ordinary and popular understanding of the English language dictates interpretation of terminology within legislation." *Deville v. State,* 383 Md. 217, 223, 858 A.2d 484 (2004). Consequently, in order to determine the plain meaning of "marking," "[w]e may consult a dictionary to discern the generally understood meaning of a word." *Hackley v. State,* 161 Md.App. 1, 14, 866 A.2d 906, *aff'd,* 389 Md. 387, 885 A.2d 816 (2005). A dictionary definition of "marking" is as follows:

**1:** the act, process, or an instance of making, placing, or assigning a mark ... **2 a:** a mark made ...

Webster's New International Dictionary of the English Language Unabridged 1383 (3d ed. 1986) (examples omitted).

The same dictionary defines the noun "mark" in a myriad of ways. *Id.* at 1382–83. Pertinent to our discussion, a "mark" is defined as:

■ **b:** something placed or set up to serve as a guide or to indicate position: as (1): a conspicuous object of known position serving as a guide for travelers <a ~ for pilots> (2): something (as a line, notch, or fixed object) designed to record position ...

*Id.* at 1382.

In addition, the verb "mark" can mean:

**1 a** (1): to fix or trace the bounds or limits of: locate the boundaries of—usu. used with *out* ... **b:** to set apart by or as if by a mark or boundary—usu. used with *off* ...

*Id.* at 1383 (examples omitted). To "mark" may also be defined as "[2 **b**] (2): to indicate, express, or show by a mark or symbol ... [2] **d:** to serve as an indication of the position or course of <a sign ~*ing* the city limits ... >." *Id.* (examples omitted).

■ Given these standard definitions, we are persuaded that a "marking" under T.A. § 11–167 is a making or placing of "marks." "Marks" can be symbols, objects, or lines placed in a manner to designate boundaries and to serve as guides for, among others, travelers and drivers on roadways. Accordingly, we conclude that the lane designation marks on a roadway, such as Route 26 in Frederick County, Maryland, are "markings," and therefore, "traffic control devices" under T.A. § 11–167. Appellant's failure to obey these markings, *i.e.,* traffic control devices, was a violation of T.A. § 21–201(a).

■ Furthermore, even though the statute is unambiguous, our conclusion is supported by looking to legislative intent. As the Court of Appeals has explained: "In statutory interpretation, our primary goal is always 'to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional or part of the Rules.'" *Ray v. State,* 410 Md. 384, 404, 978 A.2d 736 (2009).

Our research suggests that a version of the term "traffic control devices" was added to the Maryland Code in approximately 1943 as part of the revision and reenactment of Article 66½ on "Motor Vehicles." *See Folck v. Anthony,* 228 Md. 73, 78, 178 A.2d 413 (1962) (noting that Chapter 1007 of the Acts of 1943 made an overall revision to the motor vehicle laws, based on recommendations of the Commission on the Revision of State Motor Vehicle Laws). However, there is little in the legislative history, beyond plain language, suggesting the meaning of the phrase "markings."

Turning then to a consideration of the entire statutory scheme, we conclude that our understanding of the plain language of "marking" and "traffic control devices" is consistent with the overall legislative purpose of the transportation laws. *See Ray,* 410 Md. at 405, 978 A.2d 736 ("When the statute is part of a larger statutory scheme, it is axiomatic that the language of a provision is not interpreted in isolation; rather, we analyze the statutory scheme as a whole considering the 'purpose, aim, or policy of the enacting body,' and

attempt to harmonize provisions dealing with the same subject so that each may be given effect." (citations omitted)).

According to T.A. § 25–104, the State Highway Administration ("SHA") is required to adopt a manual for a uniform system of traffic control devices that "shall correlate with and, as far as possible, conform to the system set forth in the most recent edition of the Manual on Uniform Traffic Control Devices for Streets and Highways." The Federal Highway Administration of the U.S. Department of Transportation publishes that uniform manual, known as the Manual on Uniform Traffic Control Devices for Streets and Highways (2009) ("MUTCD") [4]. The Introduction to the federal MUTCD provides as follows:

> **Traffic control devices shall be defined as all signs, signals, *markings,* and other devices used to regulate, warn, or guide traffic, placed on, over, or adjacent to a street, highway,** pedestrian facility, bikeway, or private road open to public travel (see definition in Section 1A.13) by authority of a public agency or official having jurisdiction, or, in the case of a private road, by authority of the private owner or private official having jurisdiction.

*Id.* at I–1 (emphasis added).

The website for the federal MUTCD also provides as follows:

> **Pavement markings are a very important part of the communication system for road users along our Nation's highways and roads.** Can you imagine traveling on a freeway, major highway, or city street without the information that pavement markings provide? Pavement markings help you correctly position your vehicle, guide you through the many different situations you encounter, indicate where passing is allowed, and warn you of upcoming conditions.
>
> **In many cases, pavement markings supplement and enhance the messages of other traffic control devices such as traffic signs and signals. Sometimes pavement**

---

4. The MUTCD is available at online at http://mutcd.fhwa.dot.gov.

markings are the only effective way of providing positive guidance or communicating certain regulations or other messages. Because markings are located on the roadway directly in line with the travel path, they can be more prominently visible than other devices and you don't have to take your eyes off the road to view them.

Pavement markings communicate their messages to you through a uniform system of colors, patterns, widths, symbols, and words. Uniformity of these features throughout the Nation, as required by the MUTCD, makes it possible for you to instantly recognize the meaning of the markings in any given situation and quickly react to them, enabling you to travel safely and efficiently along the roadway.

MUTCD: Learn About Pavement Markings, http://mutcd. fhwa.dot.gov/kno-tutintro.html (emphasis added).

In Maryland, the SHA provides a link to its version of the MUTCD ("MdMUTCD"), under the Business Standards and Specifications section of the SHA website, where links are provided to Design Manuals, Standards and Publications of the SHA.[5] Part 3 of the MdMUTCD generally covers "Markings," and Section 3A.01 specifically provides the following functions and limitations of markings:

**Markings on highways have important functions in providing guidance and information for the road user.** Major marking types include pavement and curb markings, object markers, delineators, colored pavements, barricades, channelizing devices and islands. **In some cases, markings are used to supplement other traffic control devices such as signs, signals and other markings. In other instances, markings are used alone to effectively convey regulations, guidance, or warnings in ways not obtainable by the use of other devices.**

Markings have limitations. Visibility of the markings can be limited by snow, debris, and water on or adjacent to the

---

**5.** The MdMUTCD, revised in 2009, is available online through the SHA's website at http://www.sha.maryland.gov/Index.aspx?PageId= 836.

markings. Marking durability is affected by material characteristics, traffic volumes, weather, and location. However, under most highway conditions, markings provide important information while allowing minimal diversion of attention from the roadway.

MdMUTCD § 3A.01 (emphasis added).

Part 3 also includes provisions for the type of materials and colors used to create pavement markings. *See* MdMUTCD § 3A.03 ("Pavement and curb markings are commonly placed using paints or thermoplastics; however, other suitable marking materials, including raised pavement markers and colored pavements, are also used."); MdMUTCD § 3A.04 ("Markings shall be yellow, white, red, or blue. The colors for markings shall conform to the standard highway colors. Black in conjunction with one of the above colors shall be a usable color."). Further, a number of figures in the MdMUTCD clearly demonstrate that the colored markings placed on the pavement of streets and highways are "markings" as contemplated by the manual. *See, e.g.,* MdMUTCD at 3B–6, Figure 3B–3. Examples of Three–Lane, Two–Way Marking Applications.

In addition to Part 3 of the MdMUTCD, generally covering "markings," there are numerous other marking provisions throughout the MdMUTCD dedicated to, *inter alia,* such areas as: (1) Highway Traffic Signals, *see, e.g.,* MdMUTCD § 4D.01 (Traffic Control Signal Features); (2) Traffic Control Devices for Low–Volume Roads, *see, e.g.,* MdMUTCD § 5E (Markings); (3) Temporary Traffic Control Zone Devices, *see, e.g.,* MdMUTCD § 6F.71 (Pavement Markings); § 6F.72 (Temporary Pavement Markings); (4) Traffic Controls for School Areas, *see, e.g.,* MdMUTCD § 7C (Markings); (5) Traffic Controls for Highway–Rail Grade Crossings, *see, e.g.,* MdMUTCD § 8B (Signs and Markings); (6) Traffic Controls for Bicycle Facilities, *see, e.g.,* MdMUTCD § 9C (Markings); and (7) Traffic Controls for Highway–Light Rail Transit Grade Crossings, *see, e.g.,* MdMUTCD § 10C (Signs, Illumination, and Markings).

Based on this, it is apparent that pavement markings designating the lanes on roadways are "markings" and thus "traffic control devices." Attempting to avoid this interpretation, appellant suggests that "[t]he fact that [T.A.] § 21–309 prohibits unsafe lane changes, or swerving, strongly suggests that the [l]egislature intended [T.A.] § 21–201(a) to apply to some other type of vehicular behavior."

T.A. § 21–309 provides as follows:

(a) *General rule.*—On any roadway that is divided into two or more clearly marked lanes for vehicular traffic, the following rules, in addition to any others consistent with them, apply.

(b) *Driving in single lane required.*—A vehicle shall be driven as nearly as practicable entirely within a single lane and may not be moved from that lane or moved from a shoulder or bikeway into a lane until the driver has determined that it is safe to do so.

(c) *When driving in center of three lanes permitted.*—On a roadway that is divided into three lanes and that provides for two-way movement of traffic, a vehicle may not be driven in the center lane except:

(1) While overtaking and passing another vehicle going in the same direction and while the center lane is clear of traffic within a safe distance;

(2) In preparing to make a left turn; or

(3) When the center lane is allocated exclusively to traffic moving in the same direction that the vehicle is going and the allocation is designated by a traffic control device.

(d) *Obedience to traffic control devices.*—The driver of a vehicle shall obey the directions of each traffic control device that directs specified traffic to use a designated lane or that designates those lanes to be used by traffic moving in a particular direction, regardless of the center of the roadway.

(e) *Lane changing devices—In general.*—The driver of a vehicle shall obey the directions of each traffic control

device that prohibits changing lanes on sections of a roadway.

(f) *Lane changing devices—Trucks, truck tractors, trailers, or buses.*—On a roadway that has two or more lanes for traffic moving in the same direction, the driver of any truck, truck tractor, trailer, or bus shall obey the directions of each traffic control device that requires the vehicle to be driven in a certain lane.

(g) *Two-way left turn lanes—In general.*—On a roadway along which a two-way left turn lane has been provided through traffic control devices, vehicles may not enter that lane except when preparing for or making a left turn from or into the roadway or when preparing for or making a U-turn, and may enter only if the lane is clear of an opposing movement.

(h) *Two-way left turn lanes—Distance driven in making left turn.*—A vehicle shall be driven within a lane described under subsection (g) of this section the shortest distance practicable prior to making a left turn or U-turn or after making a left turn.

(i) *Two-way left turn lanes—Left turns made only from within certain lanes.*—On roadways along which a two-way left turn lane has been placed, left turns shall be made only from within such lane.

Certainly, there are references throughout T.A. § 21–309 to traffic control devices and it appears that appellant could have additionally been charged with violating T.A. § 21–309(b), based on the fact that his swerving forced another vehicle onto the shoulder of the roadway. *Compare Rowe v. State,* 363 Md. 424, 430 n. 3, 441, 769 A.2d 879 (2001) (concluding that, in a case where the petitioner's vehicle was the only traffic in the area, a momentary lane crossing did not support a traffic stop for suspicion of violating T.A. § 21–309(b)), *with Dowdy v. State,* 144 Md.App. 325, 330, 798 A.2d 1 (2002) (distinguishing *Dowdy,* where vehicle veered back and forth between lanes on a four-lane highway, from *Rowe* and stating that "[t]his erratic driving created a potential danger to anyone who may have

been proceeding lawfully in the passing lane") *and Edwards v. State,* 143 Md.App. 155, 171, 792 A.2d 1197 (2002) (upholding traffic stop and distinguishing *Rowe* because in *Edwards* the driver briefly veered into an opposing lane of traffic). Appellant arguably could have also been charged with violating T.A. § 21–309(d), for failure to obey the directions of each traffic control device that directs specified traffic to use a designated lane.

 But, even though there are two statutes that could apply to appellant's conduct in this case, the Court of Appeals has explained that "[t]wo statutory provisions concerning the same subject matter are considered to be *in pari materia* and must be interpreted accordingly." *Chen v. State,* 370 Md. 99, 106, 803 A.2d 518 (2002). Moreover,

> the cardinal rule of statutory construction is to effectuate the intent of the legislature. We presume that the legislature intends its enactments "to operate together as a consistent and harmonious body of law." Thus, when two statutes appear to apply to the same situation, this Court will attempt to give effect to both statutes to the extent that they are reconcilable. Nevertheless, "if two statutes contain an irreconcilable conflict, the statute whose relevant substantive provisions were enacted most recently may impliedly repeal any conflicting provision of the earlier statute." We have stated, however, that "[r]epeal by implication is not favored, and is carried no farther than is required to gratify the legislative intent manifested in the later act."

*State v. Ghajari,* 346 Md. 101, 115, 695 A.2d 143 (1997) (citations omitted).

 We discern no reason to repeal T.A. § 21–201(a) by implication based on the fact that appellant could also have been charged with violating certain provisions of T.A. § 21–309. Indeed, "[i]t is well-settled that the determination of which criminal charges, if any, to bring is a matter of prosecutorial discretion." *Beverly v. State,* 349 Md. 106, 121, 707 A.2d 91 (1998); *see also Evans v. State,* 396 Md. 256, 298, 914 A.2d 25, *cert. denied,* 552 U.S. 835, 128 S.Ct. 65, 169 L.Ed.2d 53

(2007) ("State's Attorneys retain the broad discretion ... in determining which cases to prosecute, which offenses to charge, and how to prosecute the cases they bring."). Further, we agree with the State that "the two statutes are, in fact, complementary, and not irreconcilable. Indeed, while [T.A.] § 21–309, specifically proscribes the behavior of unsafe lane changes, it is completely consistent with [T.A.] § 21–201(a)(1) that requires drivers to obey any traffic control devices."

Appellant's remaining contention will not require significant discussion. Appellant suggests that interpreting T.A. § 11–167 (Traffic control device), depends on a reading of T.A. § 11–168 (Traffic control signal). The latter statute provides that a "[t]raffic control signal" is "any traffic control device, whether manually, electrically, or mechanically operated, by which traffic alternately is directed to stop and permitted to proceed." T.A. § 11–168. Clearly, the meaning of traffic control devices is not limited to that of traffic control signals. Traffic control signals are simply a subset of traffic control devises. As previously stated, pavement markings designating lanes of travel constitute "traffic control devices." Because appellant was seen swerving from lane to lane "[s]everal times," the evidence was more than sufficient to sustain appellant's conviction for failure to obey a traffic control device pursuant to T.A. § 21–201(a).

**JUDGMENTS OF THE CIRCUIT COURT FOR FREDERICK COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**