893 A.2d 1152

**Michael James BLASI**

v.

**STATE of Maryland.**

No. 2633, Sept. Term, 2004.

Court of Special Appeals of Maryland.

March 2, 2006.

484

C. William Michaels, Baltimore, David M. Williams, Chestertown, for appellant.

Brian S. Kleinbord (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel ADKINS, MEREDITH, WOODWARD, JJ.

WOODWARD, J.

On January 18, 2005, the Circuit Court for Harford County convicted appellant, Michael James Blasi, of driving under the influence of alcohol, in violation of Maryland Code (1977, 2002 Repl.Vol.), section 21–902(a)(1), of the Transportation Article (hereinafter "Trans. Art., § _____"). On appeal, appellant raises two important issues for our consideration. First, appellant asks us to find that the traffic stop was unlawful, because the police officer did not have probable cause to believe that appellant made an unsafe lane change in violation of Trans. Art., § 21–309(b). Second, appellant requests that we decide, for the first time in Maryland, that the administration of field sobriety tests by a police officer during a valid traffic stop constitutes a "search" within the meaning of the Fourth Amendment to the U.S. Constitution, and consequently, the officer must have probable cause that the driver is under the influence of alcohol before conducting such tests.

For the reasons set forth herein, we hold that: (1) under the facts of this case, the police officer had probable cause to believe that appellant made an unsafe lane change in violation of Trans. Art., § 21–309(b); and (2) the administration of field sobriety tests by a police officer constitutes a "search" within the meaning of the Fourth Amendment, but applying *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the constitutionally mandated prerequisite for conducting such tests is reasonable articulable suspicion, not probable cause, that the driver is under the influence of alcohol. Accordingly, we shall affirm the judgment of the circuit court.

## SUPPRESSION HEARING FACTS

Appellant's motion to suppress the vehicle stop and the evidence flowing from that stop came before the circuit court on January 18, 2005. The State called one witness: Trooper Harris of the Maryland State Police. Appellant testified on his own behalf, and called Karen Mitchell, his friend and a passenger in his vehicle during the stop at issue. Because the trial court found Trooper Harris "to be a very credible witness" and "accept[ed] his version of what he observe[d]," we will set forth only those facts of the events in question that appear in the testimony of Trooper Harris.

On the night of March 17, 2004, Trooper Harris was assigned to traffic enforcement in Harford County. At approximately 11:30 p.m., while on secondary patrol in the vicinity of northbound Route 24 at Wheel Road in Bel Air, he observed a medium colored Acura traveling northbound in lane two on Route 24.[1] Trooper Harris, in his marked patrol car, was in lane one, a short distance behind the Acura.[2] There was "medium traffic" on the road at that time.

---

1. Route 24 is a four lane road, two lanes northbound and two lanes southbound. Lane two is the right lane, or slow lane, of the northbound lanes..

2. Lane one is the left lane, or passing lane, of the northbound lanes.

While following the Acura, Trooper Harris observed two things: (1) the vehicle was unable to drive within its lane, and (2) the vehicle's speed fluctuated about eight to ten miles an hour above and below the posted speed limit of 55 m.p.h. Trooper Harris described the vehicle's movements:

> [The Acura was] failing to drive within a single lane. In the slow lane there would be a solid white l[i]ne that would be separating the shoulder and the right lane, and a dotted line would be separating the lane that I was in and the Defendant's lane. I noticed the vehicle would travel over the right shoulder. When I say travel over the right shoulder, the whole vehicle wasn't on the shoulder, two wheels were over the solid line. The vehicle would come back across the lane that I was traveling in and two wheels would go over the dotted line. At no time was the vehicle completely over the white line or completely over the dotted line.

Trooper Harris observed the Acura leave its lane twice: once over the solid white line separating lane two from the shoulder, and then back the other direction, across the dotted line, and into the lane occupied by Trooper Harris. He noted that "[a]lmost half" of the vehicle swerved over the solid white line and on to the shoulder of Route 24. These movements were in conjunction with the vehicle speeding up to 65 m.p.h., and then down to 45 m.p.h. The vehicle's movements and variations in speed occurred over approximately one quarter of a mile, on a straight and level section of Route 24.[3] Trooper Harris was not aware of any external factor, thing, or other car that might have caused the Acura to leave its lane. Trooper Harris noted, "I never lost sight of the vehicle."

Based on his observations, Trooper Harris activated his emergency equipment and initiated a traffic stop of the Acura. Upon approaching the Acura, Trooper Harris advised appel-

---

**3.** Trooper Harris's calculation of one quarter of a mile is based on the distance between the intersections of Route 24 and Singer Road and Route 24 and Wheel Road, which is approximately one mile. At the time Trooper Harris encountered the Acura, he was at the halfway point between those roads. He made the traffic stop just prior to Wheel Road.

lant, the driver, as to why he was stopped, at which time Trooper Harris detected the odor of alcohol within the vehicle. Trooper Harris asked the driver for his license and registration. He identified the driver as appellant, Michael James Blasi.

Noting that appellant had a passenger in the vehicle, Trooper Harris sought to determine whether the driver or the passenger had been drinking. He asked appellant to get out of the car and step to the rear of the vehicle. As Trooper Harris stood an arm's length away from appellant, he "detect[ed] a strong odor of alcoholic beverage emanating from [appellant's] breath and person." Trooper Harris observed that appellant's "eyes were bloodshot and glassy," and that his speech was "absolutely slurred." Trooper Harris asked appellant if he "had anything to drink," to which appellant replied, "just a few."

Trooper Harris then asked appellant to submit to a battery of field sobriety tests; appellant responded, "no problem." [4] Trooper Harris administered three standardized field sobriety tests: (1) the horizontal gaze nystagmus ("HGN"), (2) the walk-and-turn, and (3) the one-leg-stand. Prior to commencing the tests, Trooper Harris inquired of appellant as to whether he had any mental or physical impairments that would prohibit him from doing the field sobriety tests; appellant replied in the negative.

The field sobriety tests were conducted on the side of Route 24, between appellant's vehicle and the police car. The surface was flat, level, and clear of debris. On the basis of the HGN test, which measures the involuntary jerking of the eye, Trooper Harris concluded that appellant had alcohol in his

---

4. Trooper Harris noted that if appellant had refused to submit to the field sobriety tests he would have had to make a reasonable decision to place appellant under arrest, because he would not have felt comfortable letting appellant go knowing there was alcohol in his system. Trooper Harris did not promise, threaten, or induce appellant to take the field sobriety tests and did not tell him that there were any consequences if appellant refused the tests. Appellant was not told by Trooper Harris that he did not have to take the tests.

system. On the remaining tests, the walk-and-turn and one-leg-stand, appellant was unable to maintain his balance or walk heel to toe without stepping off the line. At the conclusion of the tests, Trooper Harris placed appellant under arrest. At no time did appellant object to performing the field sobriety tests, and at all times appellant was polite and cooperative.

In arguing the motion to suppress, appellant raised two issues: (1) that the initial stop of appellant was unlawful, and (2) that the field sobriety tests were unlawful because appellant was coerced into performing them, and further that the tests require probable cause because they constitute a "search in the person's mind and cogn[i]tive abilities." The State countered that the stop was proper based upon Trooper Harris's observations of appellant's vehicle as it traveled northbound on Route 24, and that "field sobriety tests are not a search."

After hearing the testimony and both parties' arguments, the court stated in relevant part:

In any event, I found the officer to be very credible and I so accept his version of what he observes.

In a quarter to a half a mile the trooper sees the Defendant's car go one half of the way over the shoulder line and back over to the left one half of the way over into another travel lane occupied by the officer's vehicle. This is quite different from the *Rowe* case, and all of this is on Route 24[,] which is a major highway. This is coupled with speeding up to sixty-five and dropping down to forty-five. All of this gives reasonable articulable suspicion to make the stop.

Upon stopping the vehicle and encountering the driver[,] he smells alcohol. Quite frankly, in fairness to the occupant driver he asks him to go to the rear so as to isolate the Defendant to make sure that the odor is coming from him and is not coming from another source inside of the car; i.e., the second individual. He goes to the back of the car and it

is coming or emanating from him, and the Defendant even acknowledges that he has had a few.

Now, the trooper asks him to do some field tests and the Defendant consents. The Court finds absolutely no coercion, no promises, no threats, no subtle threats. The Defendant due to his upbringing feels that he has no choice. The officer did nothing to coerce, et cetera. There is nothing coercive about him requesting him to come to the back of the car, nothing about the questions asked or about taking the tests, and the Court will deny the motion to suppress.

The case immediately went to trial before the circuit court, sitting without a jury. The State proceeded on only one charge, driving under the influence of alcohol in violation of Trans. Art., § 21–902(a)(1). Appellant entered a plea of not guilty, with consent to submission on an agreed statement of facts. Based on that statement, the court found appellant guilty and sentenced him to thirty days incarceration, a partially suspended fine, and three years of supervised probation. Thereafter, appellant noted a timely appeal to this Court.

## STATEMENT OF ISSUES

Appellant presents one issue with eight sub-parts for our review, which we have re-phrased as follows: [5]

I. Whether the trial court erred by determining that the police officer had probable cause of a traffic violation that justified a traffic stop of the motor vehicle operated by appellant.

II. Whether the administration of field sobriety tests by a police officer during a valid traffic stop constitutes a "search" within the meaning of the Fourth Amendment to the U.S. Constitution.

---

**5.** Appellant also raises the issues of whether the trial court erred in finding: (1) that appellant consented to performing the field sobriety tests, and (2) that there were no promises, threats, subtle threats, or coercive tactics on the part of Trooper Harris to secure appellant's consent. In light of our decision in this appeal, we need not address these issues.

III. If the administration of field sobriety tests constitutes a "search," whether the Fourth Amendment requires that the police officer have probable cause to believe that appellant was driving under the influence of alcohol *prior* to the administration of the tests.

IV. Whether appellant preserved for appellate review his contention that the administration of field sobriety tests during a valid traffic stop constitutes a custodial interrogation within the meaning of the Fifth Amendment to the U.S. Constitution and Article 22 of the Maryland Declaration of Rights.

## STANDARD OF REVIEW

In reviewing the denial of a motion to suppress evidence, we rely solely on the record developed at the suppression hearing. *State v. Green*, 375 Md. 595, 607, 826 A.2d 486 (2003); *Alston v. State*, 159 Md.App. 253, 261, 858 A.2d 1100 (2004), *cert. granted*, 390 Md. 500, 889 A.2d 418 (2006). "[W]e view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion," and accept factual findings made by the motion court that are not clearly erroneous. *State v. Rucker*, 374 Md. 199, 207, 821 A.2d 439 (2003). Although we extend great deference to the motion court's findings of fact, such as determinations of witness credibility and the weight of the evidence, we make our own independent constitutional appraisal of the law as it applies to the facts of the case. *Alston*, 159 Md.App. at 261–62, 858 A.2d 1100.

## DISCUSSION

### The Traffic Stop

The Fourth Amendment to the U.S. Constitution protects against unreasonable government searches and seizures. *See United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). A traffic stop involving a motorist is a detention that implicates the Fourth Amendment. *See United States v. Sharpe*, 470 U.S. 675, 682, 105

S.Ct. 1568, 84 L.Ed.2d 605 (1985); *Green,* 375 Md. at 609, 826 A.2d 486; *Rowe v. State,* 363 Md. 424, 432, 769 A.2d 879 (2001); *Ferris v. State,* 355 Md. 356, 369, 735 A.2d 491 (1999); *Edwards v. State,* 143 Md.App. 155, 164, 792 A.2d 1197 (2002). Such a stop does not initially violate the U.S. Constitution if a police officer has probable cause to believe that the driver has committed a traffic violation, *see Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), or where an officer has reasonable articulable suspicion that "criminal activity may be afoot." *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

> While "reasonable suspicion" is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimum level of objective justification for making the stop. The officer must be able to articulate more than an "inchoate and unparticularized suspicion or 'hunch'" of criminal activity.

*Illinois v. Wardlow,* 528 U.S. 119, 123–24, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (citations omitted).

██ Appellant argues that the trial court erred in denying his motion to suppress because Trooper Harris did not have probable cause to believe that appellant had violated any traffic law. The State counters that Trooper Harris made a lawful traffic stop after observing appellant move out of his lane on two separate occasions and drive at erratic speeds over a short distance.[6]

---

6. The State also appears to argue that the traffic stop of appellant can be justified on a separate ground of reasonable articulable suspicion of criminal activity, *i.e.,* driving under the influence of alcohol. We disagree, for the simple reason that Trooper Harris never testified that he stopped appellant's vehicle because he believed that the operator was driving while under the influence of alcohol. After describing the maneuvers of appellant's vehicle, which included "failing to drive within a single lane" and "speed [changes] eight to ten [m.p.h.] above and below [the posted speed limit]," Trooper Harris said: "With those violations observed, I activated my emergency equipment and initiated a traffic stop of [appellant's] vehicle." Reasonable suspicion justifying a traffic stop must be based on specific, *articulable* facts. *See Cox v.*

In support of his position that the traffic stop was unlawful, appellant places great emphasis on the opinion of the Court of Appeals in *Rowe*, 363 Md. 424, 769 A.2d 879. The relevant facts of *Rowe* are as follows. A Maryland State Trooper observed a van being driven in the slow lane of Interstate 95 at 1:00 a.m. *Id.* at 427–28, 769 A.2d 879. The trooper followed the van for 1.2 miles. *Id.* at 427, 769 A.2d 879. Within that distance, he observed the van cross the white edge line on the right shoulder approximately eight inches and touch the rumble strips and then immediately return to the slow lane. *Id.* at 427–28, 769 A.2d 879. When the officer observed the vehicle touch the white edge line a second time, he initiated a traffic stop for "the benefit of the driver" because "late in the evening . . . people fall[ ] asleep at the wheel." *Id.* at 428, 769 A.2d 879. The officer acknowledged that late night drivers "could have possibly been intoxicated" when not driving within a single lane. *Id.* The officer determined that Rowe was not intoxicated, but upon discovering that Rowe was driving a rental vehicle issued to another driver, and that the rental contract had expired, the officer asked to search the vehicle. *Id.* at 429, 769 A.2d 879. Rowe consented, and the ensuing search of luggage in the vehicle revealed 34,000 grams of marijuana (seventy-seven pounds). *Id.* Rowe was charged with possession of marijuana, possession with intent to distribute marijuana, and driving a rented vehicle in violation of the rental agreement. *Id.* He was also issued a warning for failure to drive within a single lane under Trans. Art., § 21–309(b).[7] *Id.* at 430, 769 A.2d 879.

---

*State,* 161 Md.App. 654, 670, 871 A.2d 647 (2005) (explaining that "it is clear that the police may effect a lawful stop of a motorist, so long as the officer is 'able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion' ") (citation omitted).

7. Section 21–309(b) provides: (b) *Driving in a single lane required.* A vehicle shall be driven as nearly as practicable entirely within a single lane and may not be moved from that lane or moved from a shoulder or bikeway into a lane until the driver has determined that it is safe to do so.

The Court of Appeals reversed this Court's affirmance of the trial court's denial of petitioner's motion to suppress the evidence derived from the traffic stop. The *Rowe* Court acknowledged that the purpose of section 21–309(b) is to promote safety on laned highways, but held:

> We conclude that the petitioner's momentary crossing of the edge line of the roadway and the later touching of that line did not amount to an unsafe lane change or unsafe entry onto the roadway, conduct prohibited by § 21–309, and thus, cannot support the traffic stop in this case.

*Id.* at 441, 769 A.2d 879.

In the instant case, appellant analogizes his situation with that of the petitioner in *Rowe*. Appellant contends that his acts of crossing onto the shoulder of the road, back over and across the line dividing the northbound lanes, coupled with speed changes from 10 m.p.h. over to 10 m.p.h. under the speed limit, were not sufficient to justify a traffic stop. Rather, he asserts that "swerving, jerking movements, or straying more consistently and for longer periods over lane lines, is necessary for there to be a 'violation' that would justify a police stop."

In response, the State argues that the case *sub judice* is distinguishable from *Rowe* and points to two more recent opinions issued by this Court, *Edwards*, 143 Md.App. 155, 792 A.2d 1197, and *Dowdy v. State*, 144 Md.App. 325, 798 A.2d 1 (2002). First, in *Edwards*, this Court concluded that the defendant's "crossing [of] the center line of an undivided, two lane road by as much as a foot, on at least one occasion, provided a legally sufficient basis to justify the traffic stop." 143 Md.App. at 171, 792 A.2d 1197. We distinguished *Rowe*, "which involved a brief crossing of an edge line separating the slow lane from a shoulder area," because of "the danger associated with veering into an opposing lane of traffic, even briefly." *Id.*

Second, in *Dowdy*, a Maryland State Trooper observed a vehicle being driven in the slow lane of two westbound lanes of Route 140 at 11:54 p.m. 144 Md.App. at 326–27, 798 A.2d 1.

As the trooper followed the vehicle he observed that "it was drifting continuously from side to side," and on two occasions the vehicle moved from the right lane across the broken lane markings. *Id.* at 327, 798 A.2d 1. Specifically, the trooper observed the left tires of the vehicle cross over the broken lane markings into lane number one for approximately one tenth of a mile, and then one half of a mile later, he observed one quarter of the vehicle cross the same lane markings and travel another tenth of a mile. *Id.* These movements of the vehicle occurred over a distance of one and one half miles. *Id.*

We distinguished the facts in *Dowdy* from those in *Rowe*. We said that in *Rowe* there was no lane change, unsafe or otherwise, because the driver only moved eight inches beyond the right edge line of the roadway, returned to the paved road, and later touched the same edge line. *See id.* at 330, 798 A.2d 1. By contrast, the vehicle in *Dowdy* "crossed over from the slow lane into the passing lane and remained there for one-tenth of a mile twice," creating a *"potential danger to anyone who may have been proceeding lawfully in the passing lane."* *Id.* (emphasis added). Moreover, the vehicle's "swaying back and forth 'continuously from side to side' for the entire mile and a half ... was far more egregious than that presented in *Rowe.*" *Id.* We concluded, *inter alia,* that the "totality of the circumstances [established] that appellant was in violation of § 21–309(b), which established probable cause for the stop." *Id.* at 331, 798 A.2d 1.

■ We agree with the State that the instant case is factually distinguishable from *Rowe,* and more analogous to *Dowdy.* Like *Dowdy,* appellant's vehicle crossed from the slow lane into the passing lane, with two wheels over the broken line, thereby creating a "potential danger to anyone who may have been proceeding lawfully in the passing lane." *Id.* at 330, 798 A.2d 1. It is true that appellant's vehicle crossed over the broken line only once, as opposed to twice in *Dowdy,* and apparently did not travel as far on the road while over the broken line, as in *Dowdy.* However, appellant's driving in this case was much more erratic than the defen-

dant's driving in *Dowdy*. In *Dowdy*, other than crossing the broken line twice, the defendant's vehicle drifted continuously from side to side *within the lane* for a mile and one half. *See id.* at 327, 798 A.2d 1. Here, in the span of only one quarter of a mile, appellant went on to the right shoulder of the road, with one half of his vehicle over the solid white line, came back to the left, and crossed over the broken line between lanes one and two, all while speeding up to 65 m.p.h. and then down to 45 m.p.h. These movements occurred on a straight, level road, without any obstructions or other external factors, and would have taken only about sixteen seconds if the vehicle averaged 55 m.p.h.

In sum, appellant made a lane change when part of his vehicle crossed from the slow lane into the passing lane, and his erratic driving immediately preceding such movement made that lane change unsafe. Under the totality of the circumstances in the case *sub judice*, we conclude that Trooper Harris made a lawful traffic stop of appellant's vehicle, because he had probable cause to believe that appellant was operating that vehicle in violation of Trans. Art., § 21–309(b).

### *Are Field Sobriety Tests A "Search"?*

Appellant contends that field sobriety tests conducted by a police officer during a valid traffic stop constitute a "search" within the scope of the Fourth Amendment's protection against unreasonable governmental searches and seizures. The State counters by arguing that field sobriety tests do not constitute a search within the meaning of the Fourth Amendment. Instead, according to the State, field sobriety tests may be administered by a police officer as a part of an investigatory stop based upon a reasonable articulable suspicion that the driver was operating a motor vehicle under the influence of alcohol.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The Supreme Court, however, "has never managed to set out a comprehensive

definition of the word 'searches' as it is used in the Fourth Amendment." Wayne R. LaFave, Search and Seizure § 2.1(a) (4th ed.2004). Initially, the Supreme Court limited the protection of the Fourth Amendment to physical intrusions by police into a "constitutionally protected area," *to wit,* persons, houses, papers, and effects. *See id.* at 430–31, 798 A.2d 1; *Goldman v. United States,* 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942); *Olmstead v. United States,* 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928); *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924).

In the seminal case of *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Supreme Court reviewed the admission into evidence at trial of the defendant's telephone conversations from a telephone booth that had been overheard and recorded by F.B.I. agents using an electronic device attached to the exterior of the booth. *See id.* at 348, 88 S.Ct. 507. The Government argued that the agents' actions did not constitute a search within the meaning of the Fourth Amendment, because a public telephone booth was not a "constitutionally protected area" and there was no physical penetration of the telephone booth. *See id.* at 351–53, 88 S.Ct. 507. Writing for the Court, Justice Stewart rejected the Government's contention by stating:

> For the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, *is not* a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

*Id.* at 351, 88 S.Ct. 507 (citations omitted).

The Court concluded that the "Government's activities in electronically listening to and recording the petitioner's words violated *the privacy upon which he justifiably relied* while using the telephone booth and this constituted a 'search and seizure' within the meaning of the Fourth Amendment." *Id.* at 353, 88 S.Ct. 507 (emphasis added). Based on a concurring opinion by Justice Harlan, the Court's holding in *Katz* has

been stated as "whenever an individual may harbor a reasonable 'expectation of privacy,' he is entitled to be free from unreasonable governmental intrusion." *Terry,* 392 U.S. at 9, 88 S.Ct. 1868 (citation omitted). The Court of Appeals of Maryland has articulated the *Katz* principle by stating that "[t]he scope of the protection afforded by the Fourth Amendment is defined in terms of the individual's 'legitimate expectation of privacy.'" *Stanberry v. State,* 343 Md. 720, 731, 684 A.2d 823 (1996); *see Sproates v. State,* 58 Md.App. 547, 563, 473 A.2d 1289 (1984) (describing the principle as a "legitimate or reasonable" expectation of privacy).[8]

When the teachings of *Katz* and its progeny are applied to field sobriety tests, we must determine whether the State has intruded into an area where an individual has a reasonable expectation of privacy. The area implicated by field sobriety tests has been described as "personal characteristics" or "physical characteristics" of an individual. *See* La Fave, at § 2.6(a); *United States v. Dionisio,* 410 U.S. 1, 14, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *United States v. Mara,* 410 U.S. 19, 21, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973).

The Supreme Court has held that the physical characteristics of a voice exemplar are not within the ambit of a reasonable expectation of privacy because "a person's voice, its tone and manner, as opposed to the content of a specific conversation, are constantly exposed to the public." *Dionisio,* 410 U.S. at 14, 93 S.Ct. 764; *see also Miles v. State,* 365 Md. 488, 513, 781 A.2d 787 (2001). Similarly, the furnishing of a handwriting exemplar is not within the Fourth Amendment's protection because "[h]andwriting, like speech, is repeatedly shown to the public." *Mara,* 410 U.S. at 21, 93 S.Ct. 774; *see also Burns v. State,* 813 So.2d 668, 681 (Miss.2001).

On the other hand, the Supreme Court has held that the obtaining of certain physical characteristics does constitute

---

**8.** Although there is a conceptual distinction between "reasonable" and "legitimate," we will consider those terms synonymous for the purposes of the instant case. *See* La Fave § 2.1(d), at 439–45.

a search under the Fourth Amendment, including taking a blood sample, *see Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); collecting breath and urine samples, *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); and obtaining scrapings from a defendant's fingernails, *Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973).[9]

Focusing on the physical characteristics of a driver that are subject to governmental intrusion during a routine traffic stop, the Colorado Supreme Court stated that "a driver of a motor vehicle has no legitimate expectation of privacy in his physical traits and demeanor that are in the plain sight of an officer during a valid traffic stop." *People v. Carlson*, 677 P.2d 310, 316 (Colo.1984). For example, an officer's observation of the driver's gait upon exiting the vehicle and walking to the rear of the vehicle "is no different than the viewing of his general physical characteristics, such as height, weight or build." *Id.* By contrast, the court held that an individual has a constitutionally protected privacy interest in the "coordinative characteristics" exposed by the administration of field sobriety tests. *Id.* at 317. Therefore, field sobriety tests constitute "a full 'search' in the constitutional sense of that term." *Id.*

In *State v. Purdie*, 209 Mont. 352, 680 P.2d 576, 578 (1984), the Montana Supreme Court initially held that the administration of field sobriety tests constitutes a mere observation of an individual's physical behavior, "which hardly amounts to an intrusion into his reasonable expectation of privacy," and therefore, does not constitute a search under the Montana or federal constitutions. The Court explained that, like voice and handwriting samples, an individual lacks any reasonable expectation of privacy in his physical behavior. *See id.*

Fourteen years later, however, the Montana Supreme Court had the occasion to revisit *Purdie* and expressly overruled its holding that field sobriety tests do not constitute a search

---

9. In Maryland, the buccal swab for a defendant's DNA is a search for Fourth Amendment purposes. *See State v. Raines*, 383 Md. 1, 14, 857 A.2d 19 (2004).

under the Fourth Amendment to the U.S. Constitution and the Montana Constitution. *See Hulse v. State*, 289 Mont. 1, 961 P.2d 75, 85 (1998). The Court cited with approval the two reasons advanced by the Oregon Supreme Court in *State v. Nagel*, 320 Or. 24, 880 P.2d 451 (1994), for concluding that field sobriety tests "ran counter to an individual's reasonable expectation of privacy[:]"

> First, an individual must perform certain maneuvers not normally performed in public, and, thus, the tests expose to view certain things not otherwise obvious through passive observation of an individual.

> Unlike the quality of one's voice or one's handwriting, people do not regularly display that type of behavior to the public—there is no reason to believe that motorists regularly stand alongside a public road reciting the alphabet, count backward from 107, stand upon one leg while counting from 1001 to 1030, or walk a line, forward and back, counting steps and touching heel to toe.

> Second, an individual has a reasonable expectation of privacy in the information an officer obtains from the field sobriety tests. The court explained that like the chemical analysis of urine, "a field sobriety test may reveal evidence of equally private facts about an individual, including whether the individual is illiterate, has [A]lzheimer's disease, or suffers from multiple sclerosis."

*Hulse*, 961 P.2d at 84 (quoting *Nagel*, 880 P.2d at 457–58).

The Montana Supreme Court concluded, as did the Oregon Supreme Court in *Nagel*, that "field sobriety tests create a situation in which police officers may observe certain aspects of an individual's physical and psychological condition which would not otherwise be observable," and potentially reveal certain information concerning that individual's physical or psychological condition. *Hulse*, 961 P.2d at 85. Thus the administration of these tests intrude into an area for which an individual has a reasonable expectation of privacy. *See id.* The Montana Supreme Court held:

[F]ield sobriety tests are not "merely observations" of a person's physical behavior, but, rather, constitute a search under the Fourth Amendment to the United States Constitution . . . because an individual's constitutionally protected privacy interests are implicated in both the process of conducting the field sobriety tests and in the information disclosed by the tests.

*Id.*

In the case *sub judice*, the State contends that "field sobriety tests differ in no meaningful way from the myriad of other observations made in the course of a routine DUI stop . . . except that the former are administered in a standardized manner." The Fourth Amendment, according to the State, does not prohibit a police officer from making "non-standardized" observations (*e.g.*, observing a driver's gait, speech, ability to follow instructions, *etc.*), and to differentiate between these permitted observations and field sobriety tests would be an "arbitrary distinction" under the Fourth Amendment. We disagree.

█ The State overlooks the rationale underlying the Fourth Amendment's protection of an individual's personal or physical characteristics. The Fourth Amendment provides no protection for "[w]hat a person knowingly exposes to the public," *Katz*, 389 U.S. at 351, 88 S.Ct. 507, which includes physical characteristics that are constantly exposed to the public, *see Dionisio*, 410 U.S. at 14, 93 S.Ct. 764. Thus an individual's physical characteristics or behaviors, such as speech, height, weight, gait, appearance, or smell, observed by a police officer during a valid traffic stop, do not constitute a search under the Fourth Amendment. *See Hulse*, 961 P.2d at 85; *Carlson*, 677 P.2d at 316.

On the other hand, as appellant properly notes in his brief, the field sobriety tests

are not, by any means, the sort of normal physical activity that one displays to the public. One just does not see an individual standing at a streetcorner [sic], sitting on a park

bench, or riding in an elevator, while touching an index finder to the nose, attempting to balance while walking in a straight line in a heel to toe fashion with arms at the sides, or reciting the alphabet backwards.

Moreover, the field sobriety tests may reveal private facts about an individual's physical or psychological condition. *See Nagel,* 880 P.2d at 457–58.

■■■ We agree with the Montana Supreme Court in *Hulse,* and the Oregon Supreme Court in *Nagel,* that the administration of field sobriety tests by a police officer during a valid traffic stop intrude into an area of an individual's reasonable expectation of privacy because: (1) the process of conducting field sobriety tests exposes certain aspects of an individual not otherwise observable by the public; and (2) the information disclosed by the field sobriety tests may reveal private facts about an individual's physical or psychological condition. Therefore, we hold that the administration of field sobriety tests by a police officer during a valid traffic stop constitutes a search within the meaning of the Fourth Amendment to the U.S. Constitution.

### Constitutionally Mandated Grounds for Conducting Field Sobriety Tests

Given that the administration of field sobriety tests constitutes a search within the meaning of the Fourth Amendment, appellant argues that a police officer must have probable cause before conducting such tests during a valid traffic stop. Appellant claims that in the case *sub judice,* Trooper Harris did not have probable cause to require appellant to perform the field sobriety tests on the evening in question. The State responds that upon balancing the government's compelling interest in preventing drunk driving with the minimal intrusion occasioned by the field sobriety tests, the constitutional prerequisite for administering field sobriety tests is reasonable articulable suspicion that the operator of the vehicle is

driving under the influence of alcohol. In the instant case, the State contends that Trooper Harris had more than reasonable suspicion that appellant was driving under the influence of alcohol.[10]

In *Terry*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, the Supreme Court decided that a governmental search within the ambit of the Fourth Amendment does not, *ipso facto*, require "probable cause" to justify such action. The Court said:

> But we deal here with an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure. Instead, the conduct involved in this case must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures.

*Id.* at 20, 88 S.Ct. 1868 (footnote omitted). The Court concluded that "there is 'no ready test for determining reasonableness other than by balancing the need to search (or seize) against the invasion which the search (or seizure) entails.' " *Id.* at 21, 88 S.Ct. 1868. In applying the balancing test to the facts of *Terry*, the Court held:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, . . . he is entitled for the protection of himself and others in the area to conduct a carefully limited search

---

10. The State also contends, and appellant disputes, that Trooper Harris had probable cause to arrest appellant *prior* to the administration of the field sobriety tests because of appellant's erratic driving, odor of an alcoholic beverage on his breath and person, bloodshot eyes, slurred speech, and admission of drinking. In light of our opinion in this case, we do not find it necessary to address this contention. We do not suggest, however, that a court could not find probable cause to exist under facts similar to those in the instant case.

of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. *Id.* at 30, 88 S.Ct. 1868.

Applying the rationale of *Terry,* the Arizona Supreme Court held in *State v. Superior Court,* 149 Ariz. 269, 718 P.2d 171 (1986), that although field sobriety tests constitute a search under the Fourth Amendment, those tests may be justified by a police officer's "reasonable suspicion (based on specific, articulable facts) that the driver is intoxicated." *Id.* at 176. The Arizona Court refused to adopt the probable cause standard, explaining:

[T]he threat to public safety posed by a person driving under the influence of alcohol is as great as the threat posed by a person illegally concealing a gun. If nothing in the initial stages of the stop serves to dispel the highway patrol officer's reasonable suspicion, fear for the safety of others on the highway entitles him to conduct a "carefully limited search" by observing the driver's conduct and performance of standard, reasonable tests to discover whether the driver is drunk. The battery of roadside sobriety tests is such a limited search. The duration and atmosphere of the usual traffic stop make it more analogous to a so-called *Terry* stop than to a formal arrest.

*Id.*

Many other jurisdictions also have held that reasonable articulable suspicion, not probable cause, is the constitutional prerequisite for the administration of field sobriety tests by a police officer. *See McCormick v. Municipality of Anchorage,* 999 P.2d 155, 160 (Alaska Ct.App.2000); *State v. Lamme,* 19 Conn.App. 594, 563 A.2d 1372, 1375 (1989), *aff'd,* 216 Conn. 172, 579 A.2d 484 (1990); *State v. Taylor,* 648 So.2d 701, 703–04 (Fla.1995); *State v. Golden,* 171 Ga.App. 27, 318 S.E.2d 693, 696 (1984); *State v. Wyatt,* 67 Haw. 293, 687 P.2d 544, 552–53 (1984); *State v. Pick,* 124 Idaho 601, 861 P.2d 1266, 1270 (1993); *State v. Stevens,* 394 N.W.2d 388, 391 (Iowa 1986); *State v. Little,* 468 A.2d 615, 617–18 (Me.1983); *Commonwealth v. Blais,* 428 Mass. 294, 701 N.E.2d 314, 317 (1998);

*Columbus v. Anderson,* 74 Ohio App.3d 768, 600 N.E.2d 712, 714 (1991).

Only the supreme courts of Colorado, in *Carlson,* 677 P.2d at 316–17, and Oregon, in *Nagel,* 880 P.2d at 458–59, have held that for field sobriety tests to be constitutionally permissible, they must be supported by probable cause. In *Hulse,* 289 Mont. 1, 961 P.2d 75, the Montana Supreme Court expressly rejected the holdings of *Carlson* and *Nagel* when it concluded "that the State's interest in administering field sobriety tests based upon particularized suspicion rather than the more stringent standard of probable cause substantially outweighs the resulting limited intrusion into an individual's privacy." *Id.* at 87.

■ Applying the balancing test of *Terry,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, to the case *sub judice,* we first observe that the State of Maryland has a "compelling interest in controlling and preventing drunk driving." *Rowe,* 363 Md. at 442, 769 A.2d 879; *see also Motor Vehicle Admin. v. Shrader,* 324 Md. 454, 464, 597 A.2d 939 (1991) (explaining that "[t]he General Assembly's goal in enacting the drunk driving laws ... is 'to meet the considerable challenge created by this problem by enacting a series of measures to rid our highways of the drunk driver menace' "). Indeed, many longtime practitioners in this area of the law can recall that, twenty-five years ago, it was not illegal *per se* to drive in the State of Maryland with a specified blood alcohol concentration ("BAC"); that *prima facie* evidence of driving while intoxicated was a driver with a BAC of 0.15 or more; and that *prima facie* evidence of driving while impaired by alcohol was a driver with a BAC of 0.10 or more. Md.Code (1973, 1980 Repl.Vol.), Cts. & Jud. Proc., § 10–307(d)–(e). Now, it is illegal *per se* to drive in Maryland with a BAC of 0.08 or more; *prima facie* evidence of driving under the influence of alcohol [11] is a driver with a BAC of 0.08 or more; and *prima facie*

---

11. The Editor's Note to Maryland Code (1973, 2002 Repl.Vol.), section 10–307 of the Courts and Judicial Proceedings Article provides, *inter*

evidence of driving while impaired by alcohol is a driver with a BAC of 0.07 to 0.08. *See* Trans. Art., § 11–174.1(a), § 21–902(a)(2); Md.Code (1973, 2002 Repl.Vol.), Cts. & Jud. Proc., § 10–307(d),(g); MPJI–Cr., 4:10.4 A, B.

▮▮▮▮▮ Against this compelling state interest, we must next determine the substantiality of the intrusion of the field sobriety tests. Field sobriety tests are conducted on the roadside during a routine traffic stop. As the State correctly points out, the driver has already been lawfully stopped and detained because the police officer has either: (1) probable cause to believe that a traffic violation has occurred; or (2) reasonable articulable suspicion that criminal activity, such as drunk driving, may be afoot. *See Whren,* 517 U.S. at 810, 116 S.Ct. 1769; *Terry,* 392 U.S. at 30, 88 S.Ct. 1868. Upon request of the police officer, the driver is required to display his or her driver's license and registration card. Trans. Art., § 16–112(c) and § 13–409(b). The officer also has the right to order the driver out of the vehicle. *See Pennsylvania v. Mimms,* 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *Maryland v. Wilson,* 519 U.S. 408, 410, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). The officer is entitled to detain the driver "during the period of time reasonably necessary for the officer to (1) investigate the driver's *sobriety* and license status, (2) establish that the vehicle has not been reported stolen, and (3) issue a traffic citation." *Pryor v. State,* 122 Md.App. 671, 682, 716 A.2d 338 (1998) (emphasis added).

The field sobriety tests that are conducted during such routine traffic stops are standard tests used by police officers to "assess promptly the likelihood that a driver is intoxicated." *Little,* 468 A.2d at 617. These tests are "simple tasks" designed to reveal objective information about the driver's coordination, cognitive abilities, and consumption of alcohol. *See Crampton v. State,* 71 Md.App. 375, 388, 525 A.2d 1087, *aff'd* 314 Md. 265, 550 A.2d 693 (1987). Specifically, the HGN

---

*alia,* "that the term 'under the influence of alcohol' as used in this Act shall include within its meaning the conduct prohibited by the former reference to 'intoxicated'...."

test is used to determine whether a driver has alcohol in his or her system. *See Schultz v. State,* 106 Md.App. 145, 149, 664 A.2d 60 (1995). The walk-and-turn test and the one-leg-stand test focus on whether, and to what extent, the consumption of alcohol has affected a driver's normal coordination. *See generally Crampton,* 71 Md.App. at 388, 525 A.2d 1087. The "alphabet" and "number counting" tests measure the effect of alcohol on a driver's ability to speak with recollection. *See generally id.* These tests are short in duration and limited in purpose. Therefore, similar to a limited search of a person's outer clothing for the presence of weapons in order to protect the safety of an officer and others, we conclude that field sobriety tests are a minimal intrusion into a driver's constitutionally protected privacy interests. *See Superior Court,* 718 P.2d at 176.

In weighing the State's compelling interest in combating drunk driving against the minimal intrusion of the field sobriety tests, we agree with the rationale and holdings of the Arizona Supreme Court in *Superior Court* and the Montana Supreme Court in *Hulse.* The field sobriety tests are like *Terry* stops because "public safety is equally threatened by a person driving under the influence as by a person illegally concealing a gun." *Hulse,* 961 P.2d at 86; *see also Superior Court* 718 P.2d at 176. A field sobriety test is a "carefully limited search," because an officer simply observes the driver's performance of "standard, reasonable tests to discover whether the driver is drunk." *Superior Court,* 718 P.2d at 176. Moreover, because field sobriety tests are used to determine whether probable cause exists for an arrest, "to require probable cause that an individual has been driving under the influence *before* allowing police officers to administer field sobriety tests *would defeat the very purpose of those tests."* *Hulse,* 961 P.2d at 87 (emphasis added). Therefore, we conclude that the administration of field sobriety tests, based on an officer's reasonable articulable suspicion of drunk driving, clearly outweighs the intrusion caused by such tests into an individual's reasonable expectation of privacy.

██ Consequently, we hold that although the administration of field sobriety tests by a police officer during a valid traffic stop constitutes a search within the meaning of the Fourth Amendment, the conduct of those tests is constitutionally permissible when the officer has reasonable articulable suspicion that the driver is under the influence of alcohol.[12]

██ In the instant case, we have already determined that Trooper Harris made a valid traffic stop of appellant based upon probable cause that appellant committed a traffic violation. Trooper Harris had the following specific, articulable facts prior to requesting that appellant perform the field sobriety tests. First, upon approaching appellant's vehicle and advising appellant of the reason for the stop, Trooper Harris detected an odor of alcohol from within the vehicle. Second, Trooper Harris asked appellant to exit the car, and to step to the rear of the vehicle. There Trooper Harris detected a strong odor of an alcoholic beverage emanating from appellant's breath and person. Third, Trooper Harris observed that appellant's eyes were bloodshot and glassy, and that his speech was "absolutely slurred." Finally, appellant admitted to Trooper Harris that he had "just a few" drinks. It is clear from these facts that Trooper Harris had more than reasonable articulable suspicion that appellant was driving under the influence of alcohol. *See Ferris*, 355 Md. at 391, 735 A.2d 491 (stating that "[b]loodshot eyes, in conjunction with the odor of alcohol emanating from the person, would ordinarily provide the police with reasonable suspicion that a driver

---

12. Appellant also contends that under Article 26 of the Maryland Declaration of Rights, the administration of field sobriety tests by a police officer constitutes a search that can be justified only upon the existence of probable cause. This argument is without merit. The Court of Appeals has held consistently that "Article 26 of the Maryland Declaration of Rights is to be interpreted *in pari materia* with the Fourth Amendment." *Fitzgerald v. State*, 384 Md. 484, 506, 864 A.2d 1006 (2004); *see also Scott v. State*, 366 Md. 121, 139, 782 A.2d 862 (2001); *Gadson v. State*, 341 Md. 1, 8 n. 3, 668 A.2d 22 (1995). Therefore, Article 26 of the Maryland Declaration of Rights "does not accord appellant any greater protection than the Fourth Amendment to the United States Constitution." *See Henderson v. State*, 89 Md.App. 19, 24, 597 A.2d 486 (1991).

was under the influence of alcohol"). Therefore, we conclude that Trooper Harris had sufficient grounds under the Fourth Amendment to administer field sobriety tests to appellant at the roadside during the traffic stop.

### *Miranda Implications*

Appellant argues that the field sobriety tests conducted in the instant case were a "detailed and involved effort" amounting to custodial interrogation within the meaning of the Fifth Amendment to the U.S. Constitution and Article 22 of the Maryland Declaration of Rights. The State counters that appellant's *Miranda* claim is not preserved, and, in any event, is without merit, because appellant was not in "custody" during the field sobriety tests, and therefore was not entitled to *Miranda* warnings. We agree with the State that appellant's claim is not preserved for our review.

The scope of our review is set forth in Maryland Rule 8–131(a), which states in relevant part: "Ordinarily, the appellate court will not decide any ... issue unless it plainly appears by the record to have been raised in or decided by the trial court." Although Rule 8–131(a) provides the reviewing court with the authority to decide issues not raised below, "such power is solely within the court's discretion and is in no way mandatory." *See Conyers v. State*, 354 Md. 132, 148, 729 A.2d 910 (1999). In *State v. Bell*, 334 Md. 178, 188, 638 A.2d 107 (1994), the Court of Appeals stated:

> It is clear from the plain language of Rule 8–131(a) that an appellate court's review of arguments not raised at the trial level is discretionary, not mandatory. The use of the word "ordinarily" clearly contemplates both those circumstances in which an appellate court will not review issues if they were not previously raised and those circumstances in which it will.

Nevertheless, "the main purpose of Md. Rule 8–131(a) is to make sure that all parties in a case are accorded fair treatment, and also to encourage the orderly administration of the law." *Conyers*, 354 Md. at 148–49, 729 A.2d 910; *see also*

*Bell,* 334 Md. at 189, 638 A.2d 107. Fairness is furthered by " 'requir[ing] counsel to bring the position of their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings.' " *Bell,* 334 Md. at 189, 638 A.2d 107 (citations omitted).

We conclude from a review of the record that appellant's *Miranda* claim is not preserved for appellate review. Appellant failed to raise the issue in his motion to suppress and accompanying memorandum, and further failed to assert it during the suppression hearing. It is of no consequence that appellant presents a constitutional question. *See Medley v. State,* 52 Md.App. 225, 231, 448 A.2d 363 (1982) (recognizing that even constitutional issues may be waived if not properly raised at the trial court level pursuant to Rules 885 and 1085, both predecessors to current Maryland Rule 8–131(a)). We also decline to exercise our discretion to review appellant's *Miranda* claim and, consequently, will not address appellant's last question in this appeal.

**JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY AFFIRMED; APPELLANT TO PAY COSTS.**