NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: September 17, 2024

S24A0913.  GONZALEZ v. THE STATE.

BETHEL, Justice.

Jesus Olvera Gonzalez was convicted of malice murder in connection with the stabbing death of Jesus Arizaga.[1] On appeal, Gonzalez contends that the trial court erred by denying his motion to suppress a statement that he made to police before he was given the warnings required by *Miranda*[2] and that the trial court erred by failing to suppress certain DNA evidence and photographs. For the

---

[1] The crimes occurred on September 8, 2019. On February 10, 2020, a Forsyth County grand jury indicted Gonzalez for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), and aggravated assault (Count 3). At a May 2022 trial, a jury found Gonzalez guilty of all counts. The trial court sentenced Gonzalez to serve life in prison on Count 1, and the remaining counts merged or were vacated by operation of law.

Gonzalez filed a timely motion for new trial, which was later amended through new counsel. Gonzalez waived an evidentiary hearing on the motion, and the trial court denied the amended motion on March 15, 2024. Gonzalez then filed a timely notice of appeal, and his case was docketed to the August 2024 term of this Court and submitted for a decision on the briefs.

[2] *Miranda v. Arizona,* 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

reasons that follow, we affirm.

1. On September 8, 2019, at 5:10 a.m., Forsyth County 911 received a call reporting a stabbing at a residence.[3] The caller, B. O.,[4] requested an ambulance, saying that his cousin's friend, who was later identified as Arizaga, had been stabbed and was bleeding. B. O. further reported that his cousin, later identified as Gonzalez, and Arizaga had been drinking and began arguing, that Gonzalez had stabbed Arizaga, and that Gonzalez was crying outside the residence with B. O.'s parents.

Several officers arrived at the home approximately six minutes later. As the officers approached the residence, B. O. notified them that Arizaga was inside and that Gonzalez was still outside talking to B. O.'s parents. Sergeant White, one of the responding officers, located Gonzalez standing with two other individuals outside the residence. Gonzalez had blood on his hands and shirt. Sergeant White immediately handcuffed Gonzalez and asked him, "Where's

---

[3] The recording of the 911 call was admitted into evidence at trial and played for the jury.

[4] B. O. was a minor at the time of the crimes and subsequent trial.

the knife?" Gonzalez pointed towards the house and then verbally confirmed that the knife was inside the house.

Meanwhile, other responding officers had proceeded inside the residence to locate the victim and clear the scene. The officers discovered Arizaga lying on the floor of a bedroom with several stab wounds. Officers performed CPR, but Arizaga died from his injuries. The knife was found on the floor near Arizaga.

Gonzalez was arrested and transported to the police station. Later that day at the police station, a crime-scene specialist took pictures of Gonzalez's blood-stained clothing and body and collected swabs from his hands, which had dried blood on them. The pictures were admitted into evidence at trial. The swabs were tested, and the blood collected from Gonzalez's hands was determined to be Arizaga's.

Juan Olvera, another of Gonzalez's cousins, testified at trial that he shared a room with Gonzalez and was awakened that morning by Gonzalez and Arizaga when the two came into the bedroom. Gonzalez and Arizaga began fighting, and Olvera testified

3

that he saw Gonzalez strike Arizaga repeatedly (though he did not see anything in Gonzalez's hand and testified that he "couldn't see the details"), saw Arizaga bleeding, and then observed Gonzalez abruptly leave the room to go outside. Olvera attempted to staunch Arizaga's bleeding and then woke up his parents and sent them outside with Gonzalez.

B. O., meanwhile, testified that he observed Gonzalez and Arizaga enter the house from the garage, arguing. B. O. testified that the two went into Olvera's room and that Gonzalez walked out of the bedroom and left the house a few minutes later. When Gonzalez came back inside, B. O. observed a knife in Gonzalez's pocket, saw him go back into Olvera's room, and, a few seconds later, heard groaning coming from the room. B. O. notified his parents, called 911, observed Gonzalez leave the house, and saw his parents follow Gonzalez.

2. In his first enumeration of error, Gonzalez argues that the trial court erred by denying his motion to suppress his statement made to Sergeant White after he was handcuffed at the scene.

4

Specifically, Gonzalez argues that his statement indicating where the murder weapon was located was inadmissible because he made the statement before receiving the warnings required by *Miranda* and that the trial court erroneously relied on the public-safety exception to *Miranda* in finding his statement admissible. Gonzalez's argument fails.

"A trial court's ruling on a motion to suppress is reviewed for abuse of discretion." *Glenn v. State*, 308 Ga. 310, 311 (2) (840 SE2d 368) (2020).

As we recently explained,

> [i]n *Miranda*, the United States Supreme Court interpreted the Fifth Amendment and set forth the now well-established rule that a defendant who is in custody and subject to interrogation "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."

*State v. Lopez-Cardona*, 319 Ga. 222, 226 (2) (a) (903 SE2d 18) (2024) (quoting *Miranda*, 384 U. S. at 479 (III)). Though statements

5

obtained in violation of *Miranda* are generally inadmissible, in *New York v. Quarles*, 467 U. S. 649 (104 SCt 2626, 81 LE2d 550) (1984), the United States Supreme Court has recognized a "narrow exception" to *Miranda* that applies in "situations where there is a threat to public safety." *United States v. Newsome*, 475 F3d 1221, 1224 (II) (A) (11th Cir. 2007). Pursuant to this exception, an officer may "ask questions reasonably prompted by a concern for public safety" before giving the warnings required by *Miranda. Quarles*, 467 U. S. at 656. See also *Newsome*, 475 F3d at 1224 (II) (A) ("The public safety exception allows officers to question a suspect without first Mirandizing him when necessary to protect either themselves or the general public."); *Bowling v. State*, 289 Ga. 881, 888 (4) (a) (717 SE2d 190) (2011) (applying public-safety exception).

We conclude that the trial court did not err in finding that the public safety exception applied to Gonzalez's statement, and therefore did not abuse its discretion in denying Gonzalez's motion

6

to suppress.[5] Officers were dispatched to the crime scene following a 911 call regarding a stabbing in progress, so responding officers were alerted to the possibility that they might encounter an armed and violent assailant, whose identity was not yet known to them. After arriving at the crime scene only six minutes after the 911 call was placed, Sergeant White found Gonzalez waiting outside with blood visible on his hands and shirt. Given these circumstances, Sergeant White had a reasonable basis to believe that Gonzalez may have been armed and dangerous. After handcuffing Gonzalez, he asked what was necessary to secure the scene and prevent injury to the responding officers and others present at the scene, specifically, "Where's the knife?" See *Bowling*, 289 Ga. at 888 (4) (a) (despite lack of *Miranda* warnings, officer's question regarding location of gun fell within the public safety exception as officer was "confronted with an immediate need to locate a gun that the suspect recently possessed"

---

[5] The parties do not dispute that Gonzalez was in custody at the time Sergeant White questioned him about the location of the knife. See *Jenkins v. State*, 317 Ga. 585, 594 (2) (b) (894 SE2d 566) (2023) ("*Miranda* warnings must be administered to an accused who is in custody and subject to interrogation or its functional equivalent." (citation and punctuation omitted)).

7

and had likely discarded nearby, which "posed more than one danger to public safety" (citation and punctuation omitted)). And Sergeant White asked only the single question necessary to locate the knife, which was proper to protect himself, his fellow officers, and the other individuals at the scene. See *Newsome*, 475 F3d at 1225 (II) (A).

Although Gonzalez contends that the crime scene and the knife had already been secured by the time Sergeant White handcuffed and questioned him, Gonzalez points to no evidence in the record showing that Sergeant White could have known that. Indeed, the officers' testimony and the footage from Sergeant White's body camera support the trial court's finding of a rapid sequence of events, with Sergeant White focused on locating the unknown assailant while other officers cleared the interior of the residence. Because Sergeant White was entitled to take the safety measure of ascertaining the location of the knife prior to giving Gonzalez the *Miranda* warnings, the trial court did not err in finding that the public safety exception applied to Gonzalez's statement, and therefore did not abuse its discretion by denying Gonzalez's motion

to suppress. See *Martin v. State*, 277 Ga. 227, 228 (2) (587 SE2d 650) (2003) ("[T]he officer was entitled to determine the location of the knife prior to reading [the defendant] his *Miranda* rights."); *Smith v. State*, 264 Ga. 857, 859 (3) (452 SE2d 494) (1995) (holding that an officer's question regarding location of a gun was not an interrogation requiring *Miranda* warnings but an attempt to determine whether defendant was armed). Gonzalez's first enumeration of error therefore fails.

3. In his second enumeration of error, Gonzalez challenges the admission of certain evidence at trial, specifically, pictures of Gonzalez's clothing and body taken at the police station after his arrest, as well as the results of DNA testing showing that the blood on Gonzalez's hands was Arizaga's. In Gonzalez's estimation, the photographs and blood evidence should have been suppressed because they were taken from him in violation of the Fourth Amendment to the United States Constitution prohibition against unreasonable searches and because the collection of this evidence violated his right against self-incrimination under Paragraph XVI

9

of our State Constitution.[6] For the reasons explained below, each of Gonzalez's claims fails.

(a) Turning first to Gonzalez's Fourth Amendment challenge, Gonzalez argues that police, by swabbing his hands for DNA evidence and taking photographs of his body and clothing, conducted a search within the meaning of the Fourth Amendment for which a warrant was required. And because no warrant was obtained, Gonzales argues, the search was unreasonable, and the evidence collected as a result of that search was due to be suppressed.

As an initial matter, Gonzalez does not address whether this claim was preserved for ordinary appellate review. But our review of the record reflects that, despite raising the issue in a pre-trial motion to suppress, Gonzalez failed to obtain a ruling from the trial court with respect to the admissibility of this evidence on Fourth Amendment grounds.[7] Nor did Gonzalez object on Fourth

---

[6] See Ga. Const. of 1983, Art. I, Sec. I, Par. XVI ("No person shall be compelled to give testimony tending in any manner to be self-incriminating.").

[7] Though Gonzalez's appellate brief notes that the issue raised in this enumeration of error was raised in a pretrial motion to suppress, he fails to

10

Amendment grounds when the evidence was admitted during trial.[8]

Accordingly, we review only for plain error. See *Williams v. State*, 315 Ga. 490, 494 (2) n.7 (883 SE2d 733) (2023). To establish plain error,

> [f]irst, there must be an error or defect – some sort of deviation from a legal rule – that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error – discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

---

identify where in the record the trial court ruled on the issue. And we have not located anything in the record reflecting that such ruling was made. As we have explained before, it is not enough merely to raise an evidentiary issue in the trial court—a ruling must be obtained from the trial court to preserve the issue for ordinary appellate review. See *Goins v. State*, 310 Ga. 199, 204 (4) (850 SE2d 68) (2020) (Though appellant filed a pretrial motion to suppress certain evidence and the trial court held a hearing on the motion, the trial court "did not issue a ruling at the hearing or in an order, and [a]ppellant's trial counsel did not request a ruling or object when the . . . evidence was admitted during the trial. We therefore review [a]ppellant's claim only for plain error.").

[8] Instead, Gonzalez's objection relied exclusively on decisions concerning the right against compelled self-incrimination under the Georgia Constitution, and the trial court's ruling was limited to that issue.

Id. at 495 (2) (citation, punctuation, and emphasis omitted). "Satisfying all four prongs of this standard is difficult, as it should be." *Hood v. State*, 303 Ga. 420, 426 (2) (a) (811 SE2d 392) (2018) (citation and punctuation omitted).

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U. S. Const. Amend. IV. "Ordinarily, a search is deemed to be reasonable when conducted pursuant to a judicial warrant, which the Fourth Amendment requires to be supported by probable cause." *Caffee v. State*, 303 Ga. 557, 560 (2) (814 SE2d 386) (2018). On the other hand, "[s]earches conducted without a warrant are unreasonable under the Fourth Amendment unless they fall within a well-established exception to the warrant requirement," including "searches conducted pursuant to consent, the existence of exigent circumstances, and searches incident to a lawful arrest." Id.

In support of this claim of error, Gonzalez argues only that there were no exigent circumstances that justified the actions of

police officers in swabbing his hands for DNA evidence and taking photographs of his body and clothing without first obtaining a warrant. But, even assuming that the photographs and swabs constituted a search,[9] Gonzalez's argument ignores that, as we just explained above, the existence of exigent circumstances is not the only exception to the Fourth Amendment's warrant requirement. Among other exceptions to the warrant requirement is a search incident to a lawful arrest, which "'derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations.'" *Kennebrew v. State*, 299 Ga. 864, 869 (2) (a) (792 SE2d 695) (2016) (quoting *Arizona v. Gant*, 556 U. S. 332, 338 (II)

---

[9] Gonzalez cites no case law in support of his conclusory assertion that the mere taking of photographs constitutes a search within the meaning of the Fourth Amendment. Compare *Mitchell v. State*, 301 Ga. 563, 569-570 (3) (802 SE2d 217) (2017) ("Generally, in a 'search' of an individual, some tangible evidence is taken from that person: whether a physical object in the person's possession, or a sample of some part of their body, such as hair, blood, or urine. An action by the State which does not obtain any tangible item, but merely obtains information as to 'personal characteristics,' lies in a middle ground. The United States Supreme Court has concluded that . . . 'searches' include such actions as taking blood, breath, or urine samples, removing scrapings from underneath an individual's fingernails, or obtaining DNA evidence via a cheek swab." (citations and punctuation omitted; emphasis in original)), disapproved on other grounds by *State v. Turnquest*, 305 Ga. 758, 775 (4) n.15 (827 SE2d 865) (2019).

(129 SCt 1710, 173 LE2d 485) (2009)).

Here, the record reflects that, after his arrest at the scene in the early morning hours, Gonzalez was transported to the police station and placed in an interrogation room where he remained handcuffed. Shortly before noon that same day, a crime scene investigator took photographs of Gonzalez and swabbed his hands while Gonzalez remained in the interrogation room at the police station. And the swabbings and photographs clearly were taken for the purpose of preserving evidence of the offense—that is, blood on Gonzalez's hands and clothing—that was within Gonzalez's immediate control and could be easily destroyed. See *Gant*, 556 U. S. at 339 (II) ("[A] search incident to arrest may only include the arrestee's person and the area within his immediate control— [meaning] the area from within which he might gain possession of a weapon or destructible evidence. That limitation, which continues to define the boundaries of the exception, ensures that the scope of a search incident to arrest is commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the

14

offense of arrest that an arrestee might conceal or destroy." (citation and punctuation omitted)). Gonzalez does not argue that probable cause to arrest him was lacking. See *Caffee*, 303 Ga. at 560 (2) (the search-incident-to-arrest exception "applies only if there is probable cause to arrest"). Nor does Gonzalez make any effort to demonstrate that the swabbing and photographing was unauthorized under the search-incident-to-arrest exception. See *Cupp v. Murphy*, 412 U. S. 291, 296 (93 SCt 2000, 36 LE2d 900) (1973) (given the existence of probable cause and "the ready destructibility of the evidence, no Fourth Amendment violation where police took scraping of fingernails); *Thomason v. State*, 268 Ga. 298, 303 (2) (d) (486 SE2d 861) (1997) (trial court did not err in denying motion to suppress swabs of blood that "were permissibly taken from [the defendant]'s skin surface after he was taken into custody, as they also preserved evidence"). See also 1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 2.6 (a) (6th ed. 2024) ("if a person has been lawfully arrested it really is not significant whether certain types of in-custody investigation (e.g., fingerprinting)

15

constitute a Fourth Amendment search; the investigation is lawful in any event because a valid arrest was made"). Given these circumstances, we conclude that Gonzalez has failed to meet his burden of showing that the trial court committed any error, much less a clear legal error required under plain error review, by failing to suppress the evidence on Fourth Amendment grounds. See *Ruthenberg v. State*, 317 Ga. 227, 232 (3) (892 SE2d 728) (2023) (appellant carries burden of showing plain error).

(b) Relying on *Olevik v. State*, 302 Ga. 228, 243 (806 SE2d 505) (2017), Gonzalez further argues that he was compelled to act and produce evidence against himself in violation of his state constitutional right against self-incrimination when police told him to produce his hands palms up and palms down to provide access to the specific DNA-covered areas the police needed to obtain evidence from and when they told him to remove his shirt and pose at various angles for photographs.[10] But as the trial court correctly determined

_____

[10] Gonzalez objected to this effect at trial, and thus this error was preserved for ordinary appellate review. See *Adams v. State*, 306 Ga. 1, 3 (1)

16

*Olevik* does not support Gonzalez's argument. Rather, in *Olevik*, we explicitly stated that "the right against compelled self-incrimination is not violated where a defendant is compelled only to be present so that certain incriminating evidence may be procured from him" and that "the right is not violated when evidence is taken from a defendant's body or photographs of the defendant are taken." Id. at 242 (2) (c) (iii). Gonzalez's claim therefore fails. See id.

*Judgment affirmed. All the Justices concur.*

(829 SE2d 126) (2019) ("In order to preserve an objection for ordinary appellate review, the specific ground of the objection must be made at the time the challenged evidence is offered." (cleaned up)).